IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

**LADRENA THOMAS**, as Personal
Representative of the **ESTATE OF
DAVINIAN D. WILLIAMS, DECEASED**,

      Plaintiff,

                                  Case No.: 3:13-cv-776-39PDB

vs.

**THE CITY OF JACKSONVILLE; THE
JACKSONVILLE SHERIFF'S OFFICE;
JOHN H. RUTHERFORD**, in his official capacity
as Sheriff of the Consolidated City of Jacksonville
and Duval County, Florida; and **OFFICER
JEFFREY S. EDWARDS**,

      Defendants.

_____/

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CITY OF JACKSONVILLE'S MOTION FOR SUMMARY JUDGMENT

There are a multitude of genuine issues of material fact that preclude the Court from entering a summary judgment in favor of Defendant City of Jacksonville (the "City").[1]

## I.   INTRODUCTION[2]

This case involves the death of an unarmed citizen, Davinian D. Williams ("Mr. Williams"), who was killed by Officer Jeffrey S. Edwards ("Officer Edwards") of the Jacksonville Sheriff's Office (the "JSO") on May 9, 2012 during a routine traffic stop. Mr.

---

[1] As Plaintiff sues the City of Jacksonville, the Jacksonville Sheriff's Office, and Sheriff John H. Rutherford (*see* doc. 2), references herein to each of the defendants are one and the same, unless otherwise specified. *See Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985).

[2] Plaintiff incorporates herein her arguments and assertions presented in opposition to the summary judgment motion of Defendant Jeffrey Edwards (doc. 29).

Williams was alleged only to have failed to comply with Officer Edwards' verbal commands, but not to have committed any crime. Mr. Williams, who remained seated in the driver's seat throughout the stop, was shot by Officer Edwards six times, through the rear left window, within 90 seconds after being stopped.

Plaintiff contends that Defendants are liable for the constitutional deprivations suffered by Mr. Williams because the JSO's *de facto* policies, practices and customs, exhibiting gross and deliberate indifference to the constitutional rights of the citizens in Duval County, were the moving force behind, as well as the direct and proximate cause of, the constitutional violations committed by Officer Edwards against Mr. Williams. In addition, Plaintiff alleges that Defendants, by and through their law officers, agents and employees, failed to use reasonable care in the exercise of deadly force in traffic stops, including the traffic stop of Mr. Williams, ultimately leading to his death.

## II.      STATEMENT OF FACTS[3]

At approximately 2:00 a.m. on May 9, 2012, Officer Edwards conducted a traffic stop after allegedly observing Mr. Williams commit two minor traffic violations. (Edwards depo., Doc. 31-5, pp. 85-87, 94). Mr. Williams complied and pulled his vehicle into a parking lot. (*Id.* at 110). Officer Edwards pulled his patrol vehicle behind Mr. Williams' vehicle, called for backup, and exited his vehicle. (*Id.* at 114-16).

---

[3] For the convenience of the Court, Plaintiff will not file duplicate documents already filed by Defendants (docs. 31-33) and will refer to such by document and page number, e.g. (doc. __, p. __). Documents not already filed will be filed immediately hereafter under Plaintiff's Notice of Filing Documents in Support of her Response in Opposition to Defendants' Motions for Summary Judgment and *Daubert* Motion to Exclude Expert Testimony.

Instead of approaching Mr. Williams to explain the reason for the stop or to request identification, Officer Edwards stood at the rear driver's side of Mr. Williams' vehicle. Officer Edwards then relocated to the rear passenger's side of Mr. Williams' vehicle and gave verbal commands for Mr. Williams to "put his hands on the steering wheel." (*Id.* at 118, 122-24, 140-42).   Officer Edwards then drew his weapon and transitioned back to the rear driver's side of the vehicle and alleged to have instructed Mr. Williams to "put his hands on the steering wheel and don't take them off." [4]   (*Id.* at 155-56, 168).   Officer Edwards stated that Mr. Williams turned his body, looked behind him and lowered his right shoulder toward the floorboard. (*Id.* at 169-72).   At that moment, Officer Edwards fired his weapon seven times, striking and killing Mr. Williams while he sat in the driver's seat of his vehicle. (*Id.* at 172-76).

Officer Edwards never saw a weapon (it is undisputed that Mr. Williams did not have a weapon) and Mr. Williams never verbally or physically threatened him or attempted to flee. According to the radio transmissions and a soundless video recording taken from a business

---

[4] While Officer Edwards is emphatic that the last series of commands given to Mr. Williams before shooting him was to "put his hands on the steering wheel and don't take them off," (doc. 31-5, p. 178); this is contradicted by the other evidence in the record, including the deposition testimony of backup Officer Wade S. McCrea.   While Officer McCrea was arriving at the scene, he heard Officer Edwards shout "show me your hands, show me your hands" and then shots immediately fired. (McCrea depo., Doc. 31-6, p. 9). An eye witness, Xavier Castro, who was located at a business across the street, heard the same commands as Officer McCrea, then shots fired. (Castro depo., Doc. 31-9, p. 53).   Neither witness testified that he heard Officer Edwards instruct Mr. Williams' to "put his hands on the steering wheel," prior to firing his weapon.

across the street, Mr. Williams was killed less than 90 seconds after being stopped.[5]  (*See* JSO radio transmission, Doc. 33-4; Video of incident, Doc. 33-5).

Following an investigation by the Internal Affairs Department of the JSO, Sheriff Rutherford terminated Officer Edwards from his employment at the JSO for violations of the response to resistance policy, the charge of unnecessary force (JSO General Order LXII.1, Doc. 31-11, Exh. A), and the failure to confirm to work standards (JSO Operational Order 15.06.05, (Doc. 31-11, Exh. D).  (*See* Sheriff Rutherford's Internal Affairs Letter, Doc. 31-5, Exh. 18).[6]

Although this was the first time that Officer Edwards had been disciplined by the JSO, it was not the first time he had initiated force while serving as an officer.  In a nine-month period between February and November, 2011, Officer Edwards used force against five separate individuals, all African American males.  (Doc. 31-5, Exh. 4-8).  In addition,

---

[5] In their Motion for Summary Judgment, the City notes that a large quantity of cocaine was found in Mr. Williams' sock at the Medical Examiner's Office during the course of an inventory of his personal effects.  (Doc. 30, p. 8).  This assertion offers no support for the City's legal argument and appears to have been placed in the motion merely to disparage Mr. Williams as it is undisputed that Officer Edwards knew nothing of drug activity at the time he shot Mr. Williams and, of course, possession of cocaine does not impute a death sentence. However, although irrelevant to the issues at hand, Plaintiff avers there is an issue with the chain of custody of the cocaine which could potentially lead to its inadmissibility.  First, there was no evidence of cocaine found at the crime scene.  In addition, the forensic investigator responsible for Mr. Williams' death scene investigation, Christopher Alllen, was later fired from his employment for stealing items from the dead bodies that he transported, and/or while they lay in the Office of the Medical Examiners.  (See Declaration of Counsel). *(See* Declaration of Counsel).

[6] On February 20-21, 2014, an arbitration hearing was conducted wherein the union requested the reinstatement of Officer Edwards (In Re: Jeffrey Edwards vs. City of Jacksonville, Jacksonville Sheriff's Office).  Throughout the hearing, the City adamantly restated their conclusions that Officer Edwards' had violated the above-stated JSO policies and used unnecessary force against Mr. Williams. (*See* Arbitration Transcript). On April 14, 2014, Officer Edwards was ultimately reinstated.

Officer Edwards received three citizen complaints in a three month period in 2012, immediately prior to the shooting of Mr. Williams.  Again, each of the citizens were African American males.  (Doc. 31-5, Exh. 11-13).  As explained below, all of the incidents were similar and should have alerted the department to a pattern of excessive force and bias based policing.

Indeed, the JSO has a Personnel Early Warning System in place as a mechanism to trigger and correct certain patterns of behavior, such as the repeated use of force and/or bias based policing, in order to prevent a situation wherein an officer is at risk to himself and the community at large.[7]  (Hackney depo, Exh. A).  Although Officer Edwards met the criteria to be triggered and evaluated under this Early Warning System on two separate occasions (once in 2011 after using force on five separate individuals in a three month period, and once in 2012 after receiving three citizen complaints in a three month period), the system failed to either trigger him and/or generate the necessary paperwork for review.  (Hackney depo., pp. 28, 35).

Lieutenant C. R. Phelps, who was Officer Edwards's commanding officer for at least part of 2011, and up to and including May of 2012, testified that he does not remember ever getting any Early Warning System Notification Forms regarding the use of force by Officer Edwards.  In fact, Lieutenant Phelps testified that the only notifications from the Early Warning System he ever received were for traffic crashes, and it had been over ten years since he had seen one.  (Phelps depo., pp. 12, 44).

---

[7] The JSO Early Warning System states, "The early identification of employees that may require intervention efforts can increase agency accountability and offer employees a better opportunity to meet the agency's values and mission statements."

### III.   STANDARD OF REVIEW

Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. In evaluating whether the moving party has satisfied this burden, the Court must consider all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Likewise, all reasonable doubts about the facts are to be resolved in favor of the non-moving party. *Twiss v. Cuny*, 25 F.3d 1551, 1555 (11th Cir. 1994). "If reasonable minds could differ on any inferences arising from the un-disputed facts, summary judgment should be denied." *Id.* Furthermore, "if a reasonable fact finder can draw more than one inference from the facts, and that inference creates a genuine issue of material fact," summary judgment is likewise improper. *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997).

In deciding a motion for summary judgment, the Court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these functions are solely within the province of the finders of fact (i.e., the jury). *Anderson*, 477 U.S. at 249. If the record presents factual issues, the Court must not decide them; instead, the Court should deny the motion and proceed to trial. *See Burton v. Tampa Housing Auth.*, 271 F.3d 1274, 1277 (11th Cir. 2001). Essentially, "the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251-52.

IV.   **ANALYSIS**

A.   **Municipal Liability Claim Under 42 U.S.C. § 1983 (Count III).[8]**

Under the Supreme Court's decision in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), civil rights plaintiffs can bring suit against municipal entities where their "policies and practices" proximately cause constitutional injuries.   By definition, these *Monell* claims are not based on *respondeat superior*; rather, they are brought against the municipality for injuries caused directly by the entity itself.   *Monell* claims can take several forms.

First, a municipal body can be liable for implementing an express unconstitutional policy.   Official policies of a municipality include the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.   *See Pembaur v. City of Cincinatti*, 475 U.S. 469, 480-81 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68, (1970).   These are "action[s] for which the municipality is actually responsible."[9]   *Pembaur, supra*, at 479-480.

In addition, municipalities can be liable for the failure to properly train their employees.   This claim was first elucidated by the Supreme Court in *City of Canton v.*

_____

[8] With respect to Count V of the Complaint, municipal liability for deprivation of life without substantive due process (doc. 2, pp. 12-14), the plaintiff acknowledges that, under the current state of the law in this district, all claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under "substantive due process."

[9] The classic example is *Tennessee v. Garner*, 471 U.S. 1 (1985), where the City of Memphis had an express policy permitting its officers to fire their guns at persons fleeing from the police regardless of the threat posed by such individuals.   Because that policy could mean the death penalty for non-violent individuals who posed no threat to the officers or others, it was declared unconstitutional.   *Id.*

*Harris*, 489 U.S. 378, 388 (1989), which held that the provision of inadequate training to police officers can constitute a basis for suit against a municipality when the failure to train demonstrates the government's deliberate indifference to the rights of individuals its officers come into contact with.   Such deliberate indifference is commonly demonstrated in two ways.   First, the municipality is deemed to have exhibited deliberate indifference by its failure to train its employees to handle recurring situations that present obvious potential for constitutional violations.   *Id.* at 390.   Additionally, deliberate indifference exists where the plaintiff can demonstrate that the municipality has failed to provide further training after learning of a pattern of constitutional violations by its officers.   *Id.* at n. 10.   "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."   *Bd. of County Com'rs of Blyan County, Okl. v. Brown,* 520 U.S. 397, 410 (1997).   Thus, where municipal policy-makers are on actual or constructive notice that a particular omission in their training program causes employees to violate citizens' constitutional rights, the municipal body may be deemed deliberately indifferent if the policymakers choose to retain that program.   *Id.* at 407.   A government's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the [municipality] itself to violate the Constitution."   *Canton,* 489 U.S. at 395, (O'Connor, J., concurring in part and dissenting in part).

Finally, *Monell* claims can be stated for a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *McTigue v. Chicago*, 60 F.3d 381, 382

(7th Cir. 1995).   For example, district courts in the Northern District of Illinois have recognized practice claims for the failure to discipline and/or punish police officers for the use of excessive force such that the city itself thereby implicitly encourages said abuses.  *See Garcia v. City of Chicago,* 2003 U.S. Dist. LEXIS 5655 (N.D. Ill. Apr. 7, 2003); *Kindle v. City of Harvey,* 2002 U.S. Dist. LEXIS 2408 (N.D. Ill. Feb. 14, 2002*).*  This is a claim based on a lack of a policy where a city is liable, non-derivatively, for their own role in turning a blind eye to abuses.  *See Robinson v. City of Harvey*, 2001 U.S. Dist. LEXIS 1930 (N.D. Ill. Feb. 15, 2001).

### 1.      Failure to Investigate and/or Discipline ("Ratification")

As set forth above, *Monell* claims can be stated for a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law.  *McTiue,* 60 F.3d at 381.  Such claims are most commonly established as ratification claims through a failure to investigate and/or discipline officers for their constitutional violations.   The Eleventh Circuit has held that "failure to take disciplinary action against officers can give rise to an inference that a municipality has ratified conduct, thereby establishing a "custom" within the meaning of *Monell.*"  *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1443 (11th Cir. 1992).

A municipality may be liable under § 1983 where the responsible law enforcement agency has "ratified" unconstitutional conduct of the law enforcement officer who is responsible for the reprehensible conduct, by failing to investigate a citizen's complaint of constitutional violations.  *See Kimbrough v. City of Cocoa,* 2006 U.S. Dist. LEXIS 83458 (M.D. Fla. Nov. 16, 2006) (holding that the fact that the city failed to conduct further

investigations or discipline any of its officers can support a claim of ratification); *see also Salvato v. Blair,* 2014 U.S. Dist. LEXIS 64984 (M.D. Fla. May 12, 2014);

Thus, where a Sheriff's Department's failure to investigate is indicative of an official policy, there is a cognizable § 1983 claim. *Id.* Put another way, failing to investigate a complaint of constitutional violations may permit an inference that the misconduct which injured the plaintiff was pursuant to an official policy or custom. *See Bordanaro v. McLead,* 871 F.2d 1151, 1166-67 (1st Cir. 1989); *see also Church v. City of Huntsville*, 30 F.3d 1332, 1345-47 (11th Cir.1994); *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir.1987) ("a municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a 'custom or policy' if the municipality tacitly authorizes these actions or displays deliberate indifference towards the police misconduct").

Here, the JSO implemented a Personnel Early Warning System designed to assist in identifying individual and collective employee patterns of poor performance and/or misconduct and then accordingly take documented action to correct deficiencies which are flagged by the system. Any of the following parameters which occur within a three-month period are envisioned to alert the JSO to an employee that is a problem pursuant to their Early Warning System:

1.  Three or more internal complaints;

2.  Three or more formal counseling's or disciplinary actions;

3.  Two or more use of force/unnecessary force complaints and one other component, which would qualify toward a parameter;

4.  Three or more use of force incidents;

5.  Two or more use of force incidents involving discharge of a firearm and one other component, which would qualify toward a parameter;

6.  Two or more chargeable incidents or crashes;

7.      Four or more total incidents (chargeable or non-chargeable);

8.      Six or more sick leave days and one other component, which would qualify toward a parameter;

9.      Six or more days absent as injured on duty and one other component, which would qualify toward a parameter;

10.     Two or more sick leave days attached to days off and one other component which would qualify toward a parameter; or

11.     Two or more days absent without authority and one other component which would qualify toward a parameter.

(*See* Hackney depo., Exh. A). According to the JSO General Orders, employees who meet the above-listed criteria should be flagged or identified as to a potential pattern of behavior. (*Id.*). Theoretically, these employees are to be identified on the Employee Tracking Monthly Reports, which are to be reviewed by the Internal Affairs Lieutenant. Then, a follow up form, known as an Employee Awareness/Tracking Notification Form ("P-0410 Form"), should be created and submitted to the flagged employee's immediate supervisor. (*Id.*). The immediate supervisor is then expected to meet with the flagged employee and follow up with the appropriate strategy to correct the behavior. The supervisor is responsible for documenting these strategies or corrective action on the Employee Awareness/Tracking Form and returning to Internal Affairs for filing. (*Id.*).

Yet, a review of the Employee Tracking Monthly Reports for the years from 2008-2012 confirms that the JSO's Personnel Early Warning System was merely a "symbolic gesture" where it was not only operating improperly, but at some points completely disregarded. (*See* Drago depo., Doc. 31-10, p. 137) ("My concern was that [the JSO doesn't] follow [the Early Warning System in place], that they -- that they ignore it. It's more or less, perfunctory and nobody really uses it for anything"). For example, while this fact is not in

and of itself evidence that the Early Warning System was disregarded, it should be noted there was a drop from 95 Employee Awareness/Tracking Notification Forms being sent out in '07; to 31 in '08; to 17 in '09; back down to 12 in '10; to 17 in '11; and to 20 in '12.  (*See* Drago deposition, Doc. 31-10, Exh. D).

In addition, the JSO didn't generate the Employee Awareness Tracking Monthly Reports for most of 2008 and 2009 and some of 2010.  (Hackney depo., pp. 17-18).[10]  As a result, the Internal Affairs Lieutenant did not review the reports and therefore failed to submit any Employee Notification Forms to the flagged employee's supervisor as required by their policy.  (*Id.* at 19).  On the relatively rare occasion when the agency did actually submit the Notification Forms to the supervisors, they were rarely completed properly and actual follow up on most of those cases is undocumented.  (*Id.* at 23-27; Exh. B).

In the nine month period from February- November, 2011, Officer Edwards was reported to have used force in five separate instances against five separate individuals.  All these situations were similar in circumstances and should have alerted the department to a pattern of possible poor performance including excessive force and biased based policing, which was the purpose of the Personnel Early Warning System.[11]  However, it is undisputed

---

[10] Essentially, most of the Early Awareness Monthly Tracking Reports generated during this time period were created merely for the purpose of responding to discovery in this litigation, not tracking individual officers with patterns of potentially dangerous conduct.  (Hackney depo., pp. 17-19).

[11]  The following list documents the similarities in the Officer Edwards' use of force incidents:

    A.    All subjects were African American males.
    B.    Four of the five incidents were self-initiated where the officer picked the time, place and subject.
    C.    All subjects were stopped for very minor violations.

that the JSO's Early Warning System did not flag Officer Edwards even though he clearly met the criteria in 2011 (having three or more use of force incidents within a three-month period). Therefore, a follow up form was never generated for Officer Edwards and his immediate supervisor was never advised of his pattern of behavior.

Officer Edwards met the criteria for flagging under the Early Warning System when he received three complaints from citizens in the three month period between January 24, 2012 and March 12, 2012 (the three months immediately prior to the shooting of Mr. Williams). Again, all of these complaints contained similar allegations of excessive force and bias-based policing.[12] In this instance, as opposed to in 2011, Officer Edwards was flagged by the Early Warning System; however, the Employee Awareness/Tracking Notification Form was never completed and submitted to Defendant Edwards' supervisor for review and follow up as required by the policy. (*See* Hackney depo., Exh. D). Indeed, Agency Representative, Director Thomas Hackney, agreed that Officer Edwards met the criteria and yet could not explain why the agency failed to generate a follow up form.

---

D.  All five of the subjects reportedly fled or were attempting to flee on foot.
E.  Fleeing was the only reason for using the ECD (Taser) in four of the five incidents.
F.  The use of the ECD (Taser) for fleeing only was in violation of JSO General Order LXXII.O (72) Response to Resistance (XII) (D).

(*See* Doc. 31-5, Exh. 4-8).

[12] Citizens of Jacksonville had accused Officer Edwards of an improper traffic stop, excessive force and racially biased based policing. As with the five use of force episodes which had occurred throughout 2011, all these citizen complaints involved a similar pattern:

A.  All subjects were African American males.
B.  All incidents were self-initiated where the officer picked the time, place and subject.
C.  All subjects were stopped for very minor offenses.

(*See* Doc. 31-5, Exh. 11-13).

(Hackney deposition, p. 35) ("That gives you two internal complaints and then an unnecessary force. That may have been an error on the Lieutenant's part, because it does seem that it would fit the criteria.")

Moreover, the deposition testimony of Lieutenant Phelps deposition solidifies the conclusion that the Personnel Early Warning System was disregarded by the JSO. Lieutenant Phelps was Officer Edwards's commanding officer for at least part of 2011, and up to and including May of 2012 when Officer Edwards fatally shot Mr. Williams. Lieutenant Phelps testified that he does not remember ever getting any Early Warning System Notification Forms regarding the use of force by Officer Edwards. In fact, Lieutenant Phelps verified that the JSO Early Warning System was just a "symbolic gesture" when he explained that he had received some notifications from the Early Warning System but they were always for traffic crashes and he doesn't remember ever getting one for use of force or biased based policing. (*Id.* at pp. 12, 44) ("I just remember getting them. I - most of the ones that I would get would be for traffic crashes, and the sergeants - you would get with the sergeant, you know, talk to the sergeant about it and find out what we could do to - like I said, mine were mainly traffic crashes on the officers that I had. Learn how to drive better. ... I remember it was like a spreadsheet-type looking thing and it had a lot of people's names on them, best I can remember. I mean, this has been –it's probably been ten years ago since I saw them, or *more than ten years ago*") (emphasis added).[13]

---

[13] Officer Edwards, was one of the top use of force officers in the department. (Drago Deposition, Doc. 31-10, pp. 148-49) ("Officer Edwards had five use of force response to resistance reports in one year. That's Officer Edwards. That's the second highest in the department according to their ... response to resistance reports. So Lieutenant Phelps was

For the reasons stated above, a jury could reasonably conclude that the JSO was deliberately indifferent to the problems with their early warning system.  The failure of the JSO Personnel Early Warning System, which is in place to not only to identify police officers like Officer Edwards, but also attempt to change their behavior through corrective action, evidences the harm that can be done to the citizens of Jacksonville when policies and procedures in place to protect the public are allowed to be disregarded.  When the lack of adherence to their own policy, where they "....turn a blind eye to abuses", (*see Robinson v. City of Harvey*, 2001 U.S. Dist. LEXIS 1930 (N.D. Ill. Feb. 15, 2001); sadly here it resulted in the death Mr. Williams.

### 2.    Failure to Train and Supervise

In *City of Canton v. Harris,* a § 1983 suit was brought against a city based on the failure to provide more medical training for a police station commander. 489 U.S. 378, 388 (1989). The detainee alleged deprivation of constitutional rights when the undertrained shift commander did not call for necessary medical care when she showed signs of illness.  The record indicated that the city did provide some training to its officers.   There was no indication that such incidences were a recurring problem.  The Court, nevertheless, did not reject the plaintiff's failure to train claim as the basis for § 1983 but instead, vacated and remanded the case for further proceedings based on the jury instructions. *Id.* at 392.  The Supreme Court, for the first time, made clear that a municipality can be liable under § 1983 for the implementation of a perfectly lawful and constitutional policy when city employees applied the policy in an unconstitutional manner.   The basis for liability under such

his supervisor and hadn't seen an early warning system report regarding Officer Edwards or anybody else.  So he was clear in his testimony that nobody does anything with those.)

circumstances is dependent upon the degree of fault evidence by the municipality's action of inaction. *Id.* at 387. Specifically, "the inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388.

For obvious reasons, most failure to train claims under § 1983 rely on an implied policy from a custom or practice. *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329-30 (11th Cir. 2003) (noting that officially adopted policies are rare and most § 1983 plaintiffs must show custom or practice). Typically, to show a custom or practice a plaintiff must allege prior, similar incidents of harm that would put the government on notice of the need to train. *See Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (noting that courts typically require notice of need to train through prior similar instances). However, that is not always the case. *See Dang v. Sheriff of Seminole County*, 2014 U.S. Dist. LEXIS 111401 (M.D. Fla. Aug. 6, 2014) (finding that the allegations in the complaint were sufficient to sustain a § 1983 claim against the Sheriff, even when there were no other instances where a policy could be inferred); *Hargis v. City of Orlando, Fla.*, 2013 U.S. Dist. LEXIS 16052 (M.D. Fla. Feb. 6, 2013) (finding allegations of obvious need for training sufficient to survive motion to dismiss); *Degraw v. Gualtieri*, 2013 U.S. Dist. LEXIS 161255 (M.D. Fla. Nov. 12, 2013) (denying partial summary judgment on municipal § 1983 liability on the basis that policy based on budgetary concerns that permitted psychotic detainee to go unevaluated for up to fourteen days raised jury question).

Officer Edwards' lack of sufficient training and supervision can be inferred from the event itself. While it is true that evidence of a single event alone cannot establish a

municipal custom or policy, *see, e.g., Tuttle*, 471 U.S. at 823-24, where other evidence of a policy has been presented and the "single incident" in question involves the concerted action of a large contingent of individual municipal employees, the event itself provides, some proof of the existence of the underlying policy or custom. *Grandstaff v. Borger*,767 F.2d 161, 171-72 (5th Cir. 1985); Annotation, § 1983, 81 A.L.R. Fed. 549, 569-70 (1987).

Here, in shooting and killing Mr. Williams during a routine traffic stop, Officer Edwards exhibited the same unnecessary use of force and bias based policing that he had in the numerous instances listed above. (*See* Doc. 31-5, Exh. 4-8, 11-13). This pattern of behavior demonstrated that Officer Edwards was in need of training in the use of force, the use of the Taser,[14] biased based policing and proper patrol tactics. The failure to properly train and supervise Officer Edwards allowed him to escalate in his reprehensible pattern of behavior.

However, this is not a case where Plaintiff is relying upon circumstantial evidence of the behavior of one particular police officer who merely acted wrongfully at one time. Rather, this case is based upon the fact that the JSO had a written policy in place to protect the citizens of Jacksonville from police officers exhibiting specific behavior, like Officer Edwards, but made a conscious choice to disregard and largely ignore their policy, ostensibly

---

[14] During 2011, Officer Edwards deployed his taser on individuals who were not actively physically resisting; in violation of the JSO's and nationally accepted police practices. *See Oliver v. City of Orlando,* 2008 U.S. Dist. LEXIS 64609 (M.D. Fla. Aug. 22, 2008) *affirmed by Oliver v. Fiorino,* 586 F.3d 898 (11th Cir. 2009); *see also (*JSO Response to Resistance General Order LXXII.O (72) (XII) (D), Doc. 31-11, Ex. A). However, the JSO has chosen to allow officers to violate this policy. (Phelps depo., p. 39) ("Well, I can just tell you that they consider fleeing on foot active physical resistance and you can tase someone. … Okay. And he fled on foot. And that's enough in Jacksonville - it was when I was there - to tase someone").

maintaining it in name only.  Had the JSO's established written policy, the Personnel Early Warning System, actually been enforced, it would have led to at least some type of intervention with respect to the complaint levied against Officer Edwards just days before the subject shooting.  Thus, a reasonable jury could conclude that had the JSO not exhibited deliberate indifference, even conscious disregard for their own policies which were enacted to protect the citizens of Duval County, Mr. Williams would still be alive.

**B.**     **Claim of Negligence against the City (Count I).**

On the claim that the City can't be held liable because "there is no cause of action for negligent use of force," (doc. 30, pp. 24-25), this argument is without merit.  A plaintiff can plead a claim of negligent use of force in the alternative to an intentional tort, *see Vogel v. City of Miami*, 2007 U.S. Dist. LEXIS 85438 (S.D. Fla. Nov. 8, 2007), and the plaintiff has done so in the instant case.  *See also Ashley v. City of Hialeah*, 2011 U.S. Dist. LEXIS 83009 (S.D. Fla. July 28, 2011); *Holman v. Indiana*, 211 F.3d 399, 407 (7th Cir. 2000).  Moreover, the Florida Supreme Court's recent opinion in *Rodriguez v. Miami-Dade County*, 117 So. 3d 400 (Fla. 2013), reiterates that a municipality can indeed be liable for its police officers' negligent use of excessive force in causing harm to a citizen.

Here, Plaintiff alleges that Defendants, by and through their law officers, agents and employees, had the duty to use reasonable care in the exercise of deadly force in traffic stops, including the traffic stop of Mr. Williams.  Notwithstanding this duty, Defendants were in violation of the duty of reasonable care:

> a.     Defendant Edwards failed to conform to the following policies of the JSO: (i) General Order LXXII.0 (72), Section V (Deadly Force Policy); (ii) General Order LXXII.0 (72), Section XV (Firearms Policy); (iii) Operational Order 15.06.06 (Traffic Stops), Section IV

(Unknown Risk Stops); and (iv) Operational Order 15.06.06 (Traffic Stops), V (High Risk Stops);

b.    After calling for backup, Defendant Edwards approached the decedent's vehicle and used deadly force without waiting for the arrival of the requested backup;

c.    Defendant Edwards used deadly force in the absence of appropriate conditions for the use of such deadly force;

d.    Defendant Edwards used excessive force under all the relevant surrounding facts and circumstances;

e.    The defendants failed to properly train Officer Edwards in the use of deadly force during a traffic stop; and

f.    The defendants failed to properly supervise Officer Edwards in the use of deadly force during a traffic stop.

(Doc. 2, pp. 6-7).  As a direct and proximate result of this negligence, Mr. Williams' survivors sustained damages.  (*Id.*).

The Florida Supreme Court in *Rodriguez v. Miami-Dade County*, concluded that the trial court properly denied summary judgment in an action for negligence against a County in a police shooting case.[15]  There, the Court found that disputed issues of fact remained, including whether the police created or substantially contributed to the shooting through negligent acts.  117 So. 3d 400 (Fla. 2013).  Thus, the Court found that the police emergency exception did not apply as a matter of law to immunize the County from suit.  Rather, the Court focused on whether or not the police officers were negligent under the totality of the circumstances, which would include the fact that the police officers were responding to a burglary, and whether they perceived that they were facing a serious threat that required immediate action through the use of deadly force.  *Id.*  The Court further held,

_____

[15] In *Rodriguez*, police officers responded to a burglary alarm at Mr. Rodriguez's business, and during this incident, Mr. Rodriguez was shot by one of the responding officers.  117 So. 3d at 402.

> There is no question that, by virtue of what police officers do every day, they are often exposed to dangerous situations, especially when responding to calls involving crimes in progress.  But it is quite another thing to say that when the police respond to those situations, their employer is always immune from suit arising from negligent acts.  If police agencies were immune from tort suits in all situations where the police are called to respond to an ongoing crime, the police emergency exception could eviscerate the waiver of sovereign immunity for negligent conduct.

*Id.* at 408.

Because there remain issues of material fact in dispute concerning Officer Edward's actions in the early morning of May 9, 2012, summary judgment as to the claim of negligence is due to be denied.  *See Salvato v. Blair,* 2014 U.S. Dist. LEXIS 64984 (M.D. Fla. May 12, 2014); *Vasconez v. Hansell*, 871 F. Supp. 2d 1339 (M.D. Fla. 2012); *see also Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) (with regard to state law negligent training claim, stating that "[b]ecause [Plaintiff] only challenges the content of the [training] program, *not the way in which the program was implemented*, [the City] is entitled to sovereign immunity with respect to this claim.") (emphasis added).

## V.      CONCLUSION

There are a multitude of issues of material fact wherein a reasonable jury could conclude that JSO's *de facto* policies, practices and customs, exhibited deliberate indifference to the constitutional rights of the citizens in Duval County, and were the moving force behind, as well as the direct and proximate cause of the death of Mr. Williams.

Respectfully submitted,

**CRAIG GIBBS**
Florida Bar No. 655041
Law Office of Craig Gibbs
1200 Riverplace Blvd., Suite 810
Jacksonville, Florida 32207
Telephone: (904) 396-4499
Facsimile: (904) 396-5224
Email: cgibbs@cgibbslaw.com

**DAVID H. WILLIS**
Florida Bar No. 48820
David Willis Law Group, P.A.
320 First Street North, Suite 613
Jacksonville Beach, Florida 32250
Telephone: (904) 270-8707
Facsimile: (904) 212-0014
Email: dwillis@dwlawgroup.com

-and-

**CARL RUFUS PENNINGTON, III, P.A.**

By:    /s/ Brooke Eisenhut
————————————————————
**C. Rufus Pennington, III**
Florida Bar No. 329029
**Brooke Eisenhut**
Florida Bar No. 58538
320 North First Street Suite 609
Jacksonville Beach, Florida 32250
Telephone: (904) 339-0405
Facsimile: (904) 339-0406
Email: brooke@rufuspennington.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 9th day of October, 2014, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.  I further certify that I mailed a the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: N/A.

CARL RUFUS PENNINGTON, III, P.A.

By:   /s/ Brooke Eisenhut           
**C. Rufus Pennington, III**
Florida Bar No. 329029
**Brooke Eisenhut**
Florida Bar No. 58538
320 North First Street Suite 609
Jacksonville Beach, Florida 32250
Telephone: (904) 339-0405
Facsimile: (904) 339-0406
Email: brooke@rufuspennington.com