LADRENA THOMAS, as Personal
Representative of the Estate of
Davinian D. Williams, Deceased,

        Plaintiff,

vs.                                  Case No. 3:13-cv-776-J-39PDB

THE CITY OF JACKSONVILLE, THE
JACKSONVILLE SHERIFF'S OFFICE,
JOHN H. RUTHERFORD, in his Official
Capacity as Sheriff of the Consolidated
City of Jacksonville and Duval County,
Florida, and JEFFREY S. EDWARDS,

        Defendants.

_____

## ORDER

On May 9, 2012, Officer Jeffrey S. Edwards shot and killed Davinian D. Williams

during what started as a routine traffic stop. Officer Edwards fired seven shot at Mr.

Williams, who was sitting in the driver's seat of his parked car, and hit him six times. At

issue in this civil rights case is whether Officer Edwards' use of deadly force violated Mr.

Williams' clearly established Fourth Amendment right to be free from unreasonable

seizure under the circumstances presented here, and if so, whether the City of

Jacksonville may be held liable for that constitutional violation, as well as for its own

alleged negligence or the negligence of Officer Edwards. The case is before the Court on

Defendant Jeffrey Edwards' Motion for Summary Judgment (Doc. 29; Edwards Motion),

and Defendant City of Jacksonville's Motion for Final Summary Judgment. (Doc. 30; City

Motion). Plaintiff, Ladrena Thomas, as personal representative of Mr. Williams' estate

("Plaintiff"), has filed a response in opposition to each Motion. (Doc. 40; Response to Edwards Motion, and Doc. 41; Response to City Motion). The parties have submitted evidence in support of their respective arguments, (see Docs. 31-1 through 31-21; 33-1 through 33-5; 43-1 through 43-12; and 63),[1] and the Court has heard argument of counsel. (See Doc. 73; Minute Entry). The matter is ripe for consideration.[2]

## I. Facts[3]

### A. May 9, 2012: The Traffic Stop

On May 9, 2012, at approximately 2:00 a.m., Officer Edwards was conducting routine patrol in the Arlington neighborhood of Jacksonville, Florida. As Officer Edwards

---

[1] While the record in this case is voluminous, and indeed, Plaintiff filed additional evidentiary material more than three months after submitting her responses in opposition to the motions for summary judgment, the Court reviewed only those portions of the record specifically cited by the parties in their motions and responses. See Fed. R. Civ. P. 56(c)(1) and (c)(3) ("The court need consider only the cited materials, but may consider other materials in the record."); see also Mendenhall v. Backmun, 456 F. App'x 849, 852 (11th Cir. 2012) (district court on summary judgment did not abuse its discretion in limiting its review of the record to specific portions of the exhibits the parties expressly cited in the pleadings).

[2] In addition to naming Officer Edwards as a defendant in his individual capacity, Plaintiff has named as Defendants the City of Jacksonville, the Jacksonville Sheriff's Office, and Sheriff John H. Rutherford in his official capacity as Sheriff of the Consolidated City of Jacksonville and Duval County, Florida. A suit against a public official in his official capacity is treated as a suit against the local government entity that official represents. E.g. Kentucky v. Graham, 473 U.S. 159, 165-66 (1985); Jones v. Rutherford, 546 F. App'x 808, 810-11 (11th Cir. 2013) ("Because Jones brought [the 42 U.S.C. § 1983] suit against Rutherford in his official capacity, Jones has essentially sued Jacksonville."); Owens v. Fulton Cnty., 877 F.2d 947, 951 n.5 (11th Cir. 1989). Additionally, the Jacksonville Sheriff's Office is a department of the City of Jacksonville. As such, these municipal Defendants are all one and the same, and will be referred to as the City of Jacksonville. (See Docs. 30 at 1; 41 at 1). Because the City has been sued directly, it is proper to dismiss the claims against Sheriff Rutherford in his official capacity and the Jacksonville Sheriff's Office as redundant and potentially confusing. See Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991); Thomas v. City of Jacksonville, No. 3:13-cv-737-J-32MCR, 2014 WL 3587404, at *2 (M.D. Fla. July 18, 2014).

[3] Because this case is before the Court on Defendants' Motions for Summary Judgment, the facts recited herein and all reasonable inferences therefrom are viewed in a light most favorable to Plaintiff. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Notably, the facts regarding the encounter between Officer Edwards and Mr. Williams, for the most part, are supplied almost entirely by Officer Edwards' account of events. See generally McCullough v. Antolini, 559 F.3d 1201, 1202 (11th Cir. 2009) ("Because the plaintiff . . . is deceased and there is no complete witness testimony, we necessarily rely on the facts presented by the defendants.").

turned right from Lillian Road to Bert Road, he saw a Ford Taurus, which was later determined to have been driven by Mr. Williams, leaving the Arlingwood Apartments complex, located at 1040 Bert Road. (Doc. 31-5; Edwards Dep. at 82-84); (Doc. 31-19; Edwards Decl. ¶ 2).[4] Officer Edwards states this was the area of Jacksonville where he was normally assigned to patrol, and "I knew the Arlingwood Apartments to be a high-crime location, including drug activity and a recent shooting." Edwards Decl. ¶ 3. Edwards observed the Taurus "leave the apartment complex with such speed that it went into the oncoming lane of travel as it turned right (south) onto Bert Road." Id. ¶ 4; see also Edwards Dep. at 85 (the speed and the fact that the Taurus was on the wrong side of the road is "what first caught my attention to his vehicle.").[5]

Officer Edwards followed the Taurus, which moved back into the correct travel lane, south on Bert Road, and saw it turn right (west) onto Blackard Road, where he "briefly lost sight of the Ford Taurus for no more than a second or two." Edwards Decl. ¶ 5; Edwards Dep. at 86-87. Officer Edwards quickly identified the Taurus again as the vehicle he saw leaving the Arlingwood Apartments as it "was the only vehicle operating on Blackard Rd." Edwards Decl. ¶ 6. Officer Edwards followed the Taurus as it turned left (south) onto Arlington Road." Id. ¶ 6.

Officer Edwards states that he

> saw the Ford Taurus drive through a stop sign at the
> intersection of Arlington Rd. and Blackard Rd. at
> approximately five to ten miles per hour, then drive through a
> red traffic light, turning right (west) onto the Arlington
> Expressway Service Road.

---

[4]   Officer Edwards' Declaration is dated August 25, 2014.

[5]   The Taurus was a rental vehicle. (See Doc. 31-17 at 16; JSO Supp. Report).

3

Edwards Decl. ¶ 7; see also Edwards Dep. at 92, 94. There was no traffic in the vicinity at this time. Edwards Dep. at 94. At approximately 2:13 a.m., Officer Edwards advised headquarters that he was "initiating a traffic stop and called in the license plate number on the car." Edwards Decl. ¶ 8; (Doc. 31-17 at 45; JSO CAD log, Incident Recall). Officer Edwards also, simultaneously, turned on his patrol vehicle's emergency blue lights and siren to signal to the Taurus to stop. Edwards Decl. ¶ 8.[6]

According to Officer Edwards, the Taurus "was in the left hand lane and did not immediately stop, but traveled approximately 900 feet," passing "various places to safely stop." Edwards Decl. ¶ 9. Officer Edwards clarified that Mr. Williams was traveling on a service road parallel to a limited-access highway called the Arlington Expressway, and that a motorist would enter the expressway by accessing a ramp to the expressway from the left-hand lane of the service road. Edwards Dep. at 109. Officer Edwards testified that when he put his lights and siren on, Mr. Williams pulled into the right hand lane; "[h]e immediately acknowledged my presence, slowing to putting his signal on and getting in the right lane." Id. at 109-110. At this location, there was no parking lane along the service road. Id. at 112-13. The Taurus then turned right (north) onto Rogero Road, which was the first intersection, and came to a stop in the parking area of a vacant business to the left at the northwest corner of Rogero Road and the Service Road. Edwards Decl. ¶ 9; Edwards Dep. at 110. Officer Edwards followed the Taurus into the parking lot and stopped the patrol car "a few feet behind the Ford Taurus." Edwards

---

[6] There is evidence that Mr. Williams was talking on a cell phone with a friend when he saw that a police vehicle was "behind him," and said that he would call the person back. (See Doc. 31-17 at 18; JSO Supp. Report); (Doc. 31-8; Hinton Dep. at 44).

Decl. ¶ 10; Edwards Dep. at 114.[7]  Officer Edwards acknowledged that inasmuch as his patrol car was directly behind the Taurus, which was sandwiched between the patrol car and a building, Mr. Williams would not have been able to "turn sharp enough to drive away."  Edwards Dep. at 110.  See generally (Doc. 33; Evidence Photographs).  Additionally, Mr. Williams' vehicle was not running during the stop.  See Edwards Dep. at 154.

Officer Edwards describes what happened next:

> I immediately exited my patrol car and began to approach the Ford Taurus.  As I passed the headlamps of my patrol car, I saw the driver's window open and the driver, later identified as Davinian Williams, rocking back and forth, so I asked the dispatcher to send a back-up officer.[8]

---

[7]  In his unsworn statement, dated May 18, 2012, Officer Edwards states that after he activated his emergency siren and lights,

> The suspect's vehicle proceeded forward, while drastically slowing in speed and then changing lanes to the right travel lane.  The suspect's vehicle proceeded forward to the next intersection and made a right hand turn onto Rogero Rd.  The suspect's vehicle was still traveling extremely slowly.  Upon turning onto Rogero Rd. there is a lengthy open parking area immediately on the right side of the roadway.  The suspect's vehicle continued forward at an unusually slow pace and made a wide sweeping left turn into an unoccupied parking lot belonging to an abandoned business located on the left hand side of Rogero Rd.

(Doc. 31-19 at 11; Edwards 05/18/12 Statement at 1).

[8]  Upon stopping, Officer Edwards kept his lights flashing, and positioned the patrol car's side spotlight to direct light on the driver's side mirror and rearview mirror, as trained, for officer safety.  Edwards 05/18/12 Statement at 2; see also Edwards Dep. at 115-117 (Mr. Williams called for back up as he made his approach to Mr. Williams' vehicle, and trained the patrol car spotlight on the Taurus' driver's side mirror and rearview mirror).

Officer Edwards testified that standard procedure "in a perfect world scenario, if the officer has no concerns whatsoever of anything going on," directs that an officer conducting a traffic stop would proceed to the driver, and stand at the post between the driver's seat and the rear seat, called the "B pillar."  Edwards Dep. at 119.  Officer Edwards testified that he deviated from this procedure because of the "suspect's actions in the vehicle. . . . I saw him rocking back and forth, side to side in his seat."  Id. at 119-120.  Officer Edwards acknowledged that the rocking and reaching action could be consistent

(continued...)

5

. . . . As I approached the rear quarter panel I saw that Williams was now leaning forward with his right shoulder lower than his left.

. . .

I saw that the vehicle's driver door window was open, so I commanded Williams loudly, "Show me your hands!"

Williams ignored my commands, except to turn his head to the left and focus on trying to see me by squinting into the driver's side view mirror and looking back over his right shoulder.[9]

I again shouted loud verbal commands to Williams to show his hands. Williams did not verbally respond or obey my commands.

At this point, I stood near the driver's side rear quarter panel, and saw Williams extend only the fingertips of his left hand out the door window, just above the doorframe. I did not want to advance closer to the driver's door because Williams was leaning forward and still concealing his hands.[10]

---

[8](...continued)
with a male driver reaching for his wallet. Id. at 121. Officer Edwards said that he called for back up because

> I see him rocking back and forth. You know, it kind of raised my alert - alertness. So I called for 35 [back up] as I'm making my way all the way up there thinking, Eh, he could just be getting his wallet; could be trying to hide something, don't know. My experience is people hide things too.

Edwards Dep. at 122.

It was at this point that Officer Edwards observed that Mr. Williams was the sole occupant of the Taurus. Edwards 05/18/12 Statement at 2.

[9] Officer Edwards testified that as he approached the Taurus, he could see Mr. Williams "lean forward . . . like he was reaching for something towards the floorboard." Edwards Dep. at 133. At this point, Officer Edwards commanded Mr. Williams to "'show me your hands.'" Id. Officer Edwards saw Mr. Williams' face squinting into the driver's side mirror because of the spotlight shining into the mirror. Edwards Dep. at 133-34.

[10] After the second command to show hands, Officer Edwards saw Mr. Williams' "fingertips and only the fingertips of his left hand come out of his open window just above the door frame," while still leaning forward. Edwards Dep. at 135. Officer Edwards said that at this time he was not concerned

(continued...)

. . . I again shouted to Williams to show his hands. Williams ignored my commands, pulling his left hand back into the vehicle and continued to lean forward, appearing as if he was manipulating something on the floorboard.[11]

I made the decision to provide very specific commands, since Williams ignored all of my previous commands, so I shouted loudly to Williams, "Put your hands on top of the steering wheel."[12]

I waited momentarily and saw that Williams was again looking down at the floorboard and ignoring my commands, so I decided to move to the passenger side of Williams' car.[13]

Before I relocated, I shouted a fifth set of commands to Williams; telling Williams to place his hands on the steering wheel, but Williams ignored these commands.

I quickly moved laterally between the cars while watching Williams through the rear window.[14]

As I reached the passenger rear of Williams's vehicle, I saw that Williams had leaned back and was sitting upright . . . .[15] I moved forward to a point approximately even with the right rear passenger door and saw Williams lean forward and turn his head to look in the driver's side mirror. I noticed that

---

[10](...continued)
about a threat against his life, thinking that Mr. Williams was "just trying to hide something." Edwards Dep. at 136.

[11]  See also Edwards Dep. at 137-38.

[12]  See also Edwards Dep. at 138.

[13]  Again, Officer Edwards was at this point not in fear of his life, stating that he believed that when Mr. Williams resumed looking at the floorboard, he was looking for a dropped bag of marihuana or can of beer. Edwards Dep. at 140; 143-44. At this point, Officer Edwards decided to move to the passenger side of the Taurus "to see what is it he's trying to mess with on the floorboard." Id. at 140-41.

[14]  See also Edwards Dep. at 141-43.

[15]  Officer Edwards said that when he observed Mr. Williams sit upright, he thought Mr. Williams was going to comply with the command to put his hands on the steering wheel. Edwards Dep. at 143. Officer Edwards was still not in fear of his life at this point in time. Id. at 143-44.

Williams' arms were down between his legs and tensed up.[16]

. . .

. . . I drew my service weapon (Glock 22) and activated the attached weapon light, which enabled me to see Williams hiding his hands between his legs.[17]

In response to my weapon light, Williams turned toward me in a tensed fashion, as if he was making a fist with his hands and preparing to take some type of action.

I again loudly commanded Williams to put his hands on top of the steering wheel, giving a more specific command, "Grip the top of the steering wheel and do not let go!"

Williams again ignored my commands and instead responded by turning his head and looking directly at me and then looked back in the driver's side mirror.[18]

. . . I again commanded Williams to, "Grip the top of the steering wheel and do not let go."

Williams ignored my command and responded by cupping the doorframe with his left hand just above the inside door handle. . . .[19]

In a gun battle, my position on the passenger side of Williams' car would have been a poor strategic position, so I decided to move back to the driver's side of Williams' car. Before I moved, I again loudly ordered Williams to place his hands on the steering wheel. Again, Williams ignored my

---

[16] Officer Edwards believed that Mr. Williams leaned forward and looked into the driver's side mirror in an effort to locate Officer Edwards, because he did not believe that Mr. Williams "had any idea that I was on the passenger's side of the vehicle." Edwards Dep. at 144-46. It was at this point that Officer Edwards said that the traffic stop had morphed into a dangerous encounter. Officer Edwards determined that "there is a gun in play," and that Mr. Williams presented a threat. Id. at 147.

[17] See also Edwards Dep. at 148.

[18] See also Edwards Dep. at 151-52.

[19] See also Edwards Dep. at 156.

command and did not say anything to me.[20]

I saw Williams continue to stare into the driver's side mirror, so I moved laterally across, between Williams' car and my police car, and positioned myself at the driver's side rear quarter panel of Williams' car.

At this time, I could not see Williams' hands, which were inside the vehicle.

. . .

I began to move forward to proceed with the traffic stop, reaching a position approximately even with the left-rear passenger window, shining my weapon light inside Williams' car.

I could see Williams had both of his hands hidden between his legs with arms and shoulders still tensed up, so I gave Williams another loud verbal command to place his hands on the steering wheel.

Instead of placing his hands on the steering wheel, Williams turned to look at me, slightly blading his body and suddenly made a quick downward lunge, still looking at me over his left shoulder.

Until now, Williams' movements had been slow and controlled, but this movement was fast. I believed, absolutely, that Williams was about to shoot me, so I fired my service weapon at Williams until Williams stopped moving.[21]

Edwards Decl. ¶¶ 11, 12, 14-23, 25-33, 35-38; see also Edwards 05/18/12 Statement.

Officer Edwards said as he approached the Taurus, he never identified himself to Mr. Williams, or asked for Mr. Williams' identification or required driver documents "because he didn't afford me the opportunity." Edwards Dep. at 124. Officer Edwards said he directed Mr. Williams to show his hands "because I want to see his hands so we can

---

[20] Officer Edwards characterized his passenger-side position as "a horrible position if he rolls out with that weapon that I believe he's got now." Edwards Dep. at 158-60.

[21] See also Edwards Dep. at 169-72.

proceed forward with the stop." Edwards Dep. at 132.

Officer Edwards testified that the traffic stop escalated into a dangerous encounter at the point when he was on the passenger side of the Taurus and observed Mr. Williams "tensed up." Edwards Dep. at 146-48. Officer Edwards testified:

> What I see is he's tensed up with both his hands in his groin area. And that honestly is when the point hit me where things start transitioning here that this wasn't him just trying to hide a beer. It wasn't just him trying to hide some drugs. This was him searching round the floorboard and trying to find a weapon potentially.
>
> He's looking in that side mirror. He's waiting for me. He's trying to figure out, you know, Where is he at? . . .
>
> . . . He's ambushing me. That's what he has been doing. He has been trying to find a weapon on the floorboard and manipulating it and getting it prepped, and he's waiting to use that because he thinks I'm about to walk up next to him.
>
> . . .
>
> This is definitely the pivotal moment where this traffic stop is not like any traffic stop I've done.
>
> . . .
>
> And I think that there's now - there is a gun in play and there's definitely a threat against me.
>
> . . .
>
> Because I deemed that there was a weapon involved, and policy dictates if you're doing an unknown risk traffic stop and you become concerned for your safety, you can pull your weapon out, which is exactly what I did. I pulled my service weapon out.

Edwards Dep. at 146-48. Upon seeing Mr. Williams "cupping" the door frame with his left hand just above the interior door handle, Officer Edwards "believed [Mr. Williams] had retrieved a weapon . . . off the floorboard. . . He's posting up. He's making that decision,

I'm going to come out and engage this guy because I just glanced and I think he's by himself." Id. at 155-56.[22] Officer Edwards testified that at this point, things were "escalating even further now." Id. at 157-59. Employing a military term "OODA," Officer Edwards said that at this point "you observe, you orient, you decide, you act." Edwards Dep. at 159.

Reviewing his options, Officer Edwards testified that he rejected his first option to retreat to his patrol vehicle for cover, because of the distance back to his vehicle. "[I]f I'm trying to cover that distance back to my vehicle and he engages me, I can't return fire to protect myself," and the light from the patrol vehicle would prevent him from seeing Mr. Williams. Edwards Dep. at 160-62. Officer Edwards said he did not opt to wait for the arrival of his back up because he was "focused" on Mr. Williams. Edwards Dep. at 163. "[W]e got to the point where, given his actions, I believed he was posting up and getting ready to come out of that vehicle and engage me. So I couldn't wait for my 35 [back up] any longer. It was, I've got to make a decision and relocate." Edwards Dep. at 164. So Officer Edwards decided to relocate back to the driver's side of the Taurus which he believed gave him a "tactical advantage." Edwards Dep. at 164-65, 167. Officer Edwards testified that upon observing Mr. Williams "quickly lunge[ ] down," "I believed there was . . . a hundred percent . . . that he was committed to engaging me because I took that as an overt, aggressive movement and that's when I discharged my weapon." Edwards Dep. at 172. The driver's side window of the Taurus was in the down position at the conclusion of the traffic stop. ((Doc. 31-4 at 2; Plaintiff's Response to Admissions).

---

[22] In retrospect, Officer Edwards thinks it is possible that Mr. Williams had his wallet. "I wish he just would have done what I asked him to do. I never asked for his wallet." Edwards Dep. at 156.

Throughout his Declaration, Officer Edwards interjects his beliefs and reactions to what he was viewing. For instance, upon initially stopping Mr. Williams and witnessing Mr. Williams "rocking back and forth," Officer Edwards observes that "[f]rom my training and experience, the driver's rocking movement could have been an individual simply trying to retrieve his wallet to produce identification, or it could have been an individual trying to hide beer or drugs." Edwards Decl. ¶ 12. Additionally, Officer Edwards states that "Williams' movements, combined with the time it took to stop his car, caused me to become alert that Williams might flee on foot or was trying to conceal contraband in the vehicle." Id. ¶ 13. Officer Edwards states that he initially "did not want to advance closer to the driver's door because Williams was leaning forward and still concealing his hands. . . . I assumed Williams was trying to hide something, alcohol or drugs, on the floor of the car." Id. ¶¶ 17, 18. When he reached the passenger rear of Mr. Williams' vehicle and saw that Mr. Williams was leaning back and sitting upright, Officer Edwards "thought Williams had finished hiding whatever he was hiding and was now going to comply with my commands." Id. ¶ 23. After moving forward to the right rear passenger door and viewing Williams' leaning forward with his arms down between his legs and "tensed up," Officer Edwards concluded:

> From my training and experience, I knew that this was
> not a natural position for a person to be in during a traffic stop.
> Although Williams had not complied with my commands, he
> had not done anything that made me concerned about a
> threat against me, but Williams' posture and demeanor
> changed my mind. I now believed from Williams' refusal to
> obey my commands, lack of communication with me, visual
> tracking of my movements and posture and demeanor, that
> Williams was not trying to hide drugs or alcohol, but was
> searching the floorboard for a weapon.

12

> With the totality of what I saw, combined with my training and experience, I believed that Williams was planning an ambush. I believed that Williams had been searching the floorboard for a gun and had gotten it prepped, and appeared to be waiting for me to walk up next to him. I feared for my safety.

Edwards Decl. ¶¶ 24-25. Officer Edwards states that Mr. Williams' failure to comply with the officer's commands and alternatively looking directly at the officer and then into the driver's side mirror, "made me think that Williams was verifying whether I was alone." Id. ¶ 29. This was followed by Officer Edwards observing Mr. Williams cupping the doorframe with his left hand above the door handle, which Officer Edwards states led him to believe "that Williams thought I was alone, had a gun hidden, and was 'posting up' and making a decision to come out and attack me." Id. ¶ 30. Officer Edwards states that he later moved forward toward the left rear door of Mr. Williams' vehicle because he thought Mr. Williams was going to comply with the orders to show his hands, "[s]ince Williams had not come out and attacked me, as I had expected, and was sitting upright." Edwards Decl. ¶ 34; see also Edwards 05/18/12 Statement. Instead, Officer Edwards reacted to Mr Williams' sudden "quick downward lunge," and fired his service weapon at Mr Williams.[23] Officer Edwards acknowledges in his deposition testimony that the mere

---

[23] Xavier Castro was working at his place of business across the Arlington Expressway, about 550 feet away, when he stepped outside to smoke a cigarette at approximately 2:02 a.m. (See Doc. 31-17 at 30; JSO Supp. Report)(Doc. 31-17 at 56; JSO Evidence Report). Mr. Castro testified that the officer was standing behind the patrol car driver-side door when he fired the first shot, and that he heard the officer yell "'let me see your hands; let me see your hands.'" (Doc. 31-9; Castro Dep. at 53, 56, 65, 73). Mr. Castro said he observed the officer walk to the patrol car drivers-side headlight area and fire more shots. Id. at 67-68, 72. By the last shot, the officer was on the passenger side of the patrol car. Id. at 69; see also id. at 64. Officer Edwards suggests that Mr. Castro's testimony should be discredited because he wrongly testifies that he observed the officer fire shots from between the patrol car and the Taurus, and the fact that the Taurus' rear window was not shot makes Mr. Castro's account physically impossible. Officer Edwards also contends that Mr. Castro did not observe the entire traffic stop. Edwards Motion at 19-20. This interpretation of Mr. Castro's testimony is at odds with Mr. Castro's
(continued...)

13

refusal of someone to immediately show their hands during a traffic stop is not sufficient to justify the use of deadly force, but added that "that's not the sole reason" he fired his gun. Edwards Dep. at 173.

As Jacksonville Sheriff's Office ("JSO") Officer Wade S. McCrea approached the scene at the corner of Rogero Road, he heard Officer Edwards shout "'Show me your hands.'" (Doc. 31-6; McRae Dep. at 9). Officer McRae pulled behind the traffic stop, and "heard the shots fired." McRae Dep. at 10. Because he was watching where he was driving, Officer McRae did not see the shots fired. Id. at 11. Officer McRae pulled his vehicle behind Officer Edwards' patrol vehicle, got out of his car, and proceeded to the passenger side of Officer Edwards' vehicle. Id. Officer Edwards was standing in front of his car along the side of Mr. Williams' Taurus. Id. Officer Edwards stated to McRae that "he [Williams] kept reaching for something under the seat," id.; see also (Doc. 31-17 at 19, 20; JSO Supp. Report), and that the suspect refused to obey commands to show his hands. (Doc. 31-17 at 19, 20; JSO Supp. Report). Then Officer Edwards called for rescue and a supervisor to come to the scene. McRae Dep. at 12. Arriving officers observed the rear passenger window of the Taurus was shattered. (Doc. 31-17 at 14, 15, 19; JSO Supp. Report); (Doc. 33; Evidence Photo #5558654). Officer C.R. Short asked Officer Edwards if the suspect was still an "immediate threat," to which Officer Edwards

---

[23](...continued)

description of the events he saw. Moreover, to the extent there are discrepancies between Officer Edwards' and Mr. Castro's account of the events surrounding the shooting, these differences are not material to the Court's analysis of whether Officer Edwards violated Mr. Williams' Fourth Amendment rights, and if so, whether those rights were clearly established. See generally Miccosukee Tribe of Indians of Fla. v. U.S., 516 F.3d 1235, 1243 (11th Cir. 2008) ("A factual dispute is 'material' if it would affect the outcome of the suit under the governing law."). Additionally, the testimony from Officer Wade S. McRae and Mr. Castro that they heard Officer Edwards shout to Mr. Williams to "Show me your hands," as opposed to "put your hands on the steering wheel," does not change the Court's analysis here.

responded "'I am unsure.'" (Doc. 31-17 at 15; JSO Supp. Report). After determining that Mr. Williams was deceased, the officers conducted a cursory search of the Taurus, and found a cell phone and no weapons. (Doc. 31-17 at 15, 16; JSO Supp. Report). Mr. Williams' clinched right hand was positioned on the passenger seat of his car. (Doc. 31-17 at 14; JSO Supp. Report). Rescue pronounced Mr. Williams dead at the scene, at 2:32 a.m. (See Doc. 31-17 at 6; JSO Incident Report); (Doc. 31-17 at 10, 14, 15, 17; JSO Supp. Report).

A videotape of the encounter was recorded by a surveillance camera located on a nearby business. The video is grainy, dark, and shadowy, and has no sound. The video does show Officer Edwards' movements around Mr. Williams' vehicle, but Mr. Williams is not visible. It appears from the video that approximately 28 seconds passed between the time Officer Edwards stopped his patrol car behind Mr. Williams' vehicle, and the officer walked around the back of the Taurus to the passengers side, after having walked along the driver's side of the Taurus. Officer Edwards stood for approximately 28 seconds at the right passenger door window of Mr. Williams' vehicle, and then paused for approximately 12 seconds at the right rear of the Taurus before moving back to the driver's side of Mr. Williams' car. Approximately eighteen seconds after Officer Edwards paused at the right rear of the Taurus and then began moving back to the driver's side, Officer McRae drove up and Officer Edwards began firing his gun. What is clear from the video is how quickly the events unfolded; from beginning to end, the stop lasted approximate one minute and 30 seconds. (Doc. 33).

## B. Subsequent Findings

Mr. Williams' wallet was later found on the driver's door. Edwards Decl. ¶ 40;

15

(Doc. 33; Evidence Photo #5558654); (Doc. 31-3 at 8; Case Item History Report). Officer

Edwards states that he does not know how the wallet came to be placed on the door.

Edwards Decl. ¶ 40.

The Medical Examiner observed six gunshots penetrating Mr. Williams' body.

(Doc. 31-3 at 17; Medical Examiner's Report). All six of the bullets that hit Mr. Williams,

traveled from left to right and back to front. Five of the bullets traveled downward, and

one traveled up. (Doc. 31-1 at 17-19; Medical Examiner's Report).[24] The Medical

---

[24] These gunshots were located as follows:

1) "Gunshot wound of the left upper arm and chest," having entered first through the left lateral upper arm, exiting the left upper arm and then entering the left lateral chest, fracturing the fifth and sixth lateral ribs, and penetrating the left cardiac ventricle. The bullet was recovered from the left cardiac ventricle. "The direction of the path of the wound is from left to right, back to front, and downward."

2) "Penetrating gunshot wound of the left shoulder and left chest." The bullet entered the left lateral deltoid, penetrated the muscle and soft tissue of the left shoulder and left chest, and was recovered from the chest just left of midline. "The direction of the path of the wound is from left to right, back to front, and downward."

3) "Penetrating gunshot wound of the upper torso." "The projectile perforate[d] the muscle and soft tissue of the left upper back" and entered the chest cavity, perforating the lower lung lobe, the left cardiac ventricle, and the sternum. The bullet was recovered from the chest anterior of the sternum. "The direction of the path of the wound is from back to front, left to right, and downward."

4) "Penetrating gunshot wound of upper torso." The bullet entered the left mid-back, traveling to the chest cavity at the ninth posterior left rib, perforating the left lower lung lobe and sternum at the third rib. The bullet was recovered from the soft tissue of the mid chest. "The direction of the path of the wound is from left to right, back to front, and upward."

5) "Penetrating gunshot wound of the left upper arm and upper torso." The bullet entered the posterior left deltoid, and then entered the chest cavity at the sixth left lateral rib. "The

(continued...)

16

Examiner listed the cause of death as being "Multiple Gunshot Wounds," noting that four of the six bullets hit Mr. Williams' heart. (Doc. 31-3 at 21-22; Medical Examiner's Examination Report). A photograph of Mr. Williams shows his body in a seated reclined position in the drivers' seat. (Doc. 33; JSO Evidence Photo 5558654). Mr. Williams was 36 years old. (Doc. 31-3 at 23; Medical Examiner's Report).

The Medical Examiner found 17.1 grams of powder cocaine and .5 grams of crack cocaine in clear plastic baggies concealed in Mr. Williams' socks. (Doc. 31-1 at 17; Medical Examiner's Report); (Doc. 31-17 at 11; JSO Supp. Report); (Doc. 31-17 at 55; JSO Evidence Report); (Doc. 31-17 at 42; JSO Property Storage Card); (Doc. 33; Evidence Photos ## 5561341, 5561347, 5561359 , 5561368, 5561383); (Doc. 31-3 at 12; Toxicology Report). A baggie containing one gram of marijuana was retrieved from under the Taurus' driver seat, (Doc. 31-17 at 40; JSO Property Storage Card); (Doc. 33; Photo # 5559107), and cash in the amount of $62.16 was found in Mr. Williams' pockets. (Doc. 31-17 at 16; JSO Supp. Report).

---

[24](...continued)

> projectile then perforates the left lower lung lobe, the left cardiac atria, the left cardiac ventricle, and the right middle lung lobe. It is recovered from the right lateral lower chest. "The direction of the path of the wound is from left to right, back to front, and downward."

6) "Penetrating gunshot wound of the left upper arm and upper torso." "An entrance gunshot wound is on the posterior aspect of the left lateral deltoid." The projectile then enters the chest cavity at the fifth left lateral rib, fracturing it, and perforates the left lower long lobe, the left cardiac atria, the right cardiac atria, and the ascending aorta. It is recovered from the right lower chest. "The direction of the path of the wound is from left to right, back to front, and downward."

(Doc. 31-1 at 17-19; Medical Examiner's Report).

### C. Jacksonville Sheriff Office Policies and Proceedings

The Jacksonville Sheriff's Office Operational Order 15.06.05 establishes guidelines for stopping and approaching motorists during a traffic stop, and notes that even "routine" traffic stops can be "potentially dangerous for both officers and motorist." (Doc. 31-11 at 70; Traffic Stop Policy). The Traffic Stop Policy advises the officer to remain alert and calm, and directs the officer to greet the violator in a courteous manner; identify himself or herself; inform the driver of the nature and scope of the stop and explain the violation; ask the violator to place his or her vehicle in park; and politely request to see the driver's license, vehicle registration, and proof of insurance. Id. at 71. The Policy advises that the "officer should take action appropriate to the seriousness of the offense," and observe the driver for physical impairment, distress or drug or alcohol abuse. Id. Under the category "Unknown Risk Stops," the Policy requires an officer to notify the police dispatcher of the location of the stop. (Doc. 31-11 at 72). The Policy directs that the officer maintain a safe distance from the violator's vehicle; turn on the patrol car blue lights; and if visibility is low, illuminate the stopped vehicle with a spotlight, takedown lights, and high beam headlights. Id. at 73. "Officers should exit the patrol vehicle quickly and cautiously, approach the violator's vehicle keeping the gun hand empty," and approaching from the driver's side, observe the trunk, driver's actions and movements, interior, and passenger actions and movements. Id. The policy directs that under most circumstances in an "unknown risk" stop, the driver should remain in their vehicle during the stop. Id. at 74. The Policy also addresses "High Risk Stops, requiring the officer to notify the dispatcher about details of the stop (Doc. 31-11 at 75), and confirming the "wanted" status of the suspect. The Policy recommends that "a ["high

risk"] stop should not be made until sufficient assistance is available to make a safe arrest." Id. at 76. The Policy directs the officer making a "high risk" stop to position the police vehicle 15-20 feet behind the suspect's vehicle with the driver's door of the police vehicle being the furthest point from the suspect's vehicle; exit the police vehicle using available cover; have the firearm drawn and in the ready position; wait for assistance; and direct the driver to take the keys from the ignition, drop the keys outside of the vehicle, open the driver's door from the outside and exit the vehicle with both hands up. Id.

JSO General Order LXXII.1, sets forth the JSO's policy regarding Response to Resistence. (Doc. 31-11 at 11; Response to Resistence Policy). Article V of the Response to Resistence Policy addressees an officer's use of deadly force. (See Doc. 31-11 at 16; Deadly Force Policy). The Deadly Force Policy provides that "Officers may use deadly force when the officer reasonably believes[25] that such force is necessary to prevent imminent death or great bodily harm to themselves or another person." (Doc. 31-11 at 16). Additionally, the Policy provides that "[i]f feasible, prior to the use of deadly force, officers shall, give some warning of the possible use of deadly force, unless to do so would jeopardize the safety of the officer or any other person." Id. at 17. The Deadly Force Policy provides that an officer may draw his or her firearm "whenever officers have reason to fear for their safety or the safety of others," such as with "unknown risk traffic stops," but that "[o]fficers will not needlessly place themselves or remain in situations of

_____

[25] The Policy defines "Reasonable Belief" as existing

where the facts or circumstances the officer knows or believes to exist are such as to cause an ordinary and prudent person to act or think in a similar way under similar circumstances.

(Dc. 31-11 at 13).

great danger and use this as a justification for the use of deadly force." (Doc. 31-11 at 16-17). The JSO Response to Resistence Policy defines "Active Physical Resistance," as demonstrated by one or more of the following acts: circling the officer; forming a fist; verbalization of aggressive intent; increasing muscular tension; "blading" the body; and "any other behavior that indicates a likelihood or expectation of violence towards the officers, themselves or others." (Doc. 31-11 at 14). The Policy notes that "[f]ailure to obey verbal commands is not considered active physical resistance." Id.

On August 9, 2013, Sheriff Rutherford recommended to the JSO Internal Affairs Department that Officer Edwards be terminated as an officer with the Jacksonville Sheriff's Office, because Officer Edwards' conduct was in violation of the JSO Traffic Stop Policy and Response to Resistence Policy. (Doc. 31-5 at 122; Rutherford Internal Affairs Letter). Sheriff Rutherford recounted a number of issues with Officer Edwards' procedure. First, Sheriff Rutherford observed that Officer Edwards failed to update the dispatcher with the location of the traffic stop, or update his location when he called for back up, as required by the Traffic Stop Policy, traveling some 900 feet after his first communication. (Doc. 31-5 at 122). Sheriff Rutherford said that "[h]ad he done so, the responding back-up officer would have had an accurate location to which he could have promptly responded" and that "it is possible that [Officer] McCrea and the other responding units could have arrived prior to [Officer] Edwards firing his shots, which could have possibly changed the outcome of the entire incident." Id.

Sheriff Rutherford wrote that Officer Edwards did not attempt to greet the driver, identify himself, or request to see required documents, as stated in the Traffic Stop Policy, instead repeatedly ordering the driver to show his hands. Sheriff Rutherford noted

20

that Officer "Edwards never saw a weapon and the driver never threatened him." Id.

Sheriff Rutherford stated that when Mr. Williams placed his left hand on the window sill of the driver's door, "the investigation revealed that it was at that particular moment where the suspect was most likely demonstrating some form of compliance by placing his wallet and identification card on the edge of the door." Id. at 123. However, Sheriff Rutherford said that Officer

> Edwards did not see the wallet as he had already determined in his mind that the suspect was committed to ambushing him with a handgun. Using the standard of a reasonable officer under the same circumstances, one would have to expect that a deadly force warning should have been given, rather than giving another command for the driver to show his hands, which is what [Officer] Edwards did. Jacksonville Sheriff's Office Policy requires officers to give some warning of the possible use of deadly force if feasible. The internal investigation revealed it was feasible and reasonable at that moment to do so. Instead [Officer] Edwards moved to the driver's side of the vehicle; leaving a defensible position to go to an indefensible position.

Id. Sheriff Rutherford said that upon returning to the driver's side, Officer Edwards had another opportunity to give Mr. Williams a deadly force warning in light of the fact that "nothing happened." Id. at 123.

Sheriff Rutherford acknowledged that the State Attorney's Office determined that Officer Edwards' use of deadly force was justifiable pursuant to Florida Statutes, and that Officer Edwards' conduct did not rise to the level of being criminal conduct. (Doc. 31-5 at 123-24). However, the Sheriff contended that Officer Edwards' tactical decision to abandon his cover position and move toward the driver's door increased the odds of danger to both Officer Edwards and Mr. Williams "by creating a situation where a fatal error was likely," and thus was "negligent and contrary to good police procedure." Sheriff

Rutherford said that Officer Edwards had two options at this point: (1) taking a position of cover and concealment behind his patrol vehicle, or (2) "maintaining his position until backup officers arrived at the scene to assist him in taking the suspect in custody." Id. at 124. "Edwards did not see a weapon nor did he convey any articulable threat that would have justified the use of deadly force in this situation." Id.

Sheriff Rutherford concluded:

> Officer Edwards shot an unarmed individual who never demonstrated an articulable threat. Using the standard of a reasonable officer under the same circumstances, one would have to expect that the use of deadly force should not have been applied. Reasonableness dictates that if [Officer] Edwards did not see a weapon, and the driver's only actions were moving about in the vehicle and not placing his hands where they could be seen, [Officer] Edwards should not have discharged his firearm.

(Doc. 31-5 at 124-25).

On February 20-21, 2014, an arbitration hearing was conducted in which the Police Union requested that Officer Edwards be reinstated as a police officer with the JSO. The City repeated its assertion that Officer Edwards had violated JSO policies and used unnecessary force against Mr. Williams. (See Doc. 43-2; Arbitration Hearing Tr.). On April 14, 2014, Officer Edwards was reinstated. (See Doc. 40 at 5; Response to Edwards' Motion).[26]

### E.    Jacksonville Sheriff's Office Early Warning System

The Jacksonville Sheriff's Office maintains a Personnel Early Warning System, which it deems to be "an essential component of a well-managed law enforcement

---

[26] The parties did not provide a citation to the arbitrator's decision in the extensive record, and the Court was unable to locate it.

agency," because the "early identification of employees that may require agency intervention efforts can increase agency accountability and offer employees a better opportunity to meet the agency's values and mission statements." (Doc. 43-6 at 1; Early Warning System). The Early Warning System is set up to trigger a review when, in a three-month period, an officer has three or more use-of-force incidents or repeated citizen complaints. If implicated, the Early Warning System triggers a notification to the employee's commanding officer, and which is also forwarded to the employee's supervisor, for review with the employee. The supervisor may counsel the subject employee or require additional training, or, with prior approval of the Commanding Officer, take appropriate disciplinary action, or make an appropriate referral. Id.; see also (Doc. 31-10 at 254; JSO Internal Affairs Personnel Early Warning System Report ("On a monthly basis, early warning notifications are created for employees who meet established parameters during a three-month period.")).

The record of early warning notifications by year is as follows:

| | |
|------|----|
| 2012 | 20 |
| 2011 | 17 |
| 2010 | 12 |
| 2009 | 17 |
| 2008 | 31 |
| 2007 | 95 |

(Doc. 31-10 at 254-59; JSO Internal Affairs Personnel Early Warning System Report); (see also Doc. 31-18 at 24; Klinger Report).

Officer Edwards had previously used force against five separate individuals, all

African-American males. (See Doc. 31-5 at 73-89).[27] All Response to Resistence

Reports were reviewed by three JSO officers. In addition, according to Plaintiff, Officer

Edwards received three citizen complaints in a three-month period in 2012, all involving

African American males. (See Doc. 41 at 5). However, only two incidents are referenced

in the exhibits attached to Officer Edwards' Deposition (Exs. 11, and 12). (See Doc. 31-5

at 97-117 (Exhibits 11 and 12).[28] The JSO determined that the complaints were

_____

[27]   These previous incidents were:

    1)      February 18, 2011 use of a Electronic Control Device ("taser") on subject who Officer Edwards sought to arrest for disorderly intoxication and who attempted to flee (Doc. 31-5 at 73-76).

    2)      February 22, 2011 use of Electronic Control Device, deploying the device two times, in pursuit of a fleeing suspect who ignored commands in a petit theft investigation. (Doc. 31-5 at 77-79).

    3)      April 1, 2011 use of Electronic Control Device on fleeing suspect who initially ignored commands in a traffic stop. (Doc. 31-5 at 80-82).

    4)      June 4, 2011 use of Electronic Control Device and baton on fleeing and resisting suspect who ignored commands in loitering investigation. Suspect struck Officer Edwards and resisted the officer when being handcuffed. (Doc. 31-5 at 83-86).

    5)      November 4, 2011 use of Electronic Control Device in traffic stop on fleeing suspect who ignored commands to stop and display his hands, and who discarded felony narcotics during the chase. (Doc. 31-5 at 87-89).

[28]   The citizen complaints were:

    1)      January 24, 2012 Complaint regarding a traffic stop for speeding, and towing of rental car because the driver was not on the rental agreement and the rental company wanted the car towed. (Doc. 31-5 at 97-102).

    2)      March 12, 2012 incident Complaint regarding a traffic stop by Officer Edwards for malfunction of one of two lights illuminating the license tag such that officer could not read the license tag, and officer's demeanor. (Doc. 31-5 at 103-117).

      The Record does not appear to include the third citizen complaint, which would be Exhibit 13 to Officer Edwards' deposition. There is a reference to an incident on February 29, 2012, which apparently generated two internal complaints, one for "'Unbecoming Conduct,'" and one for "'Biased Based.'" (See Doc. 43-5 at 35; Hackney Dep. at 35). It is unclear whether this is the third citizen complaint referenced by Plaintiff in the Response to the City's Motion.

unfounded or not sustained. Id.; see also (Doc. 31-5 at 90).

Plaintiff contends that though Officer Edwards met the criteria to be evaluated under the Early Warning System on two separate occasions (once in 2011 after using a taser on three individuals in a three-month period, and once in 2012 after receiving three citizen complaints in a three-month period, (Doc. 41 at 5; Response to City Motion), the system failed to identify Officer Edwards and to generate the necessary paperwork for review. Lieutenant C.R. Phelps, who was Officer Edwards' commanding officer in 2011 and 2012, does not recall receiving any Early Warning System notification, other than for traffic crashes. (Doc. 43-11; Phelps Dep. at 12, 44). Additionally, while Officer Edwards was flagged by the Early Warning System in 2012, the Notification Form was not forwarded to Officer Edwards' supervisor for review and follow-up as required by the System. (Doc. 41 at 13; Response to City Motion (citing (Doc. 43-7 at 86; Employee Awareness Tracking Monthly Report for 12/31/2011 to 3/31/2012)). According to Defendant City's expert, David A. Klinger, the JSO transitioned to a new Early Warning System program in 2011, and failed to flag Officer Edward's three Response to Resistence reports between February 18, 2011 and April 1, 2011. (Doc. 31-18 at 25; Klinger Report). However, Officer Edwards did report all five taser incidents through the Response to Resistance procedure, and each incident was reviewed and found to be in compliance with JSO policy. (See Doc. 31-5 at 73-89; Doc. 31-15 at 3).

### E.    Plaintiff's Complaint

Plaintiff initiated this case by filing a five-count Complaint on July 2, 2013. (Doc. 2; Complaint). Plaintiff alleges negligence on the part of the City of Jacksonville and the Jacksonville Sheriff's Office (Count One); Unreasonable Seizure by Defendant Edwards,

actionable under 42 U.S.C. § 1983 (Count Two); Municipal Liability for Unreasonable

Seizure pursuant to 42 U.S.C. § 1983 (Count Three); Deprivation of Life without

Substantive Due Process by Officer Edwards, pursuant to 42 U.S.C. § 1983 (Count

Four); and Municipal Liability for Deprivation of Life Without Substantive Due Process,

pursuant to 42 U.S.C. § 1983 (Count Five).  See generally Complaint.[29]

## II.    **Standard of Review**

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Rule 56(a).  The

record to be considered on a motion for summary judgment may include "depositions,

documents, electronically stored information, affidavits or declarations, stipulations

(including those made for purposes of the motion only), admissions, interrogatory

answers, or other materials."  Rule 56(c)(1)(A).[30]  The party seeking summary judgment

---

[29]    Plaintiff has conceded that this is not an appropriate case in which to assert a Fourteenth Amendment substantive due process claim, inasmuch as excessive force claims are analyzed as a Fourth Amendment seizure. (See Doc. 40 at 7; Doc. 41 at 7).  See generally Graham v. Connor, 490 U.S. 386, 395 (1989) (holding that "all claims that law enforcement officers have used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." (emphasis in original)).  Accordingly, summary judgment is due to be entered in favor of Defendants Officer Edwards and the City on Counts Four and Five.

[30]    Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law.  The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Where the nonmoving party has failed to make a sufficient showing 'to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' there exist no genuine issues of material fact." Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

III.    **Discussion**

  A.    **Count Two: Unreasonable Seizure by Defendant Edwards and Qualified Immunity**

27

In Count Two of the Complaint, brought pursuant to 42 U.S.C. § 1983,[31] Plaintiff alleges Officer Edwards' fatal shooting of Mr. Williams during a traffic stop constituted an unreasonable seizure of Mr. Williams, in violation of the Fourth and Fourteenth Amendments of the United States Constitution, and in disregard for Mr. Williams' clearly established rights. Complaint ¶¶ 29, 30. Officer Edwards argues that the Court should grant summary judgment in his favor because Plaintiff has not established that the use of deadly force against Mr. Williams was unreasonable under the Fourth Amendment, and because the circumstances fail to establish that Officer Edwards violated clearly established law of which a reasonable officer should have been aware, thus entitling Officer Edwards to qualified immunity. (Doc. 29 at 2).

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The purpose of qualified immunity "is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." Durruthy v. Pastor, 351 F.3d 1080, 1087 (11th Cir. 2003). "When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who

---

[31] Section 1983 "provides individuals with a federal remedy for the deprivation of rights, privileges, or immunities protected by the Constitution or the laws of the United States that are committed under color of state law." Brown v. City of Huntsville, Ala., 608 F.3d 724, 733 n.12 (11th Cir. 2010) (citation omitted); see 42 U.S.C. § 1983. To state a claim for relief under § 1983, a plaintiff must sufficiently allege that he or she was "'deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law.'" See Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1276-77 (11th Cir. 2003) (quotation omitted). Here, Plaintiff asserts an underlying constitutional violation of the Fourth Amendment. The Fourth Amendment applies to state and local governments pursuant to the Due Process Clause of the Fourteenth Amendment. See Brown, 608 F.3d at 734 n.15.

knowingly violate the law.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). "But qualified immunity does not protect an official who 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'" Bussey-Morice v. Gomez, 587 F. App'x 621, 626 (11th Cir. 2014) (quoting Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003)).[32]

To obtain qualified immunity, a public official must first show that he was engaged in a discretionary duty when the allegedly wrongful act occurred. Dalrymple v. Reno, 334 F.3d 991, 995 (11th Cir. 2003). The parties do not dispute that Officer Edwards was acting within the scope of his discretionary authority as a police officer when he shot Mr. Williams. Thus, the burden shifts to Plaintiff to show that qualified immunity is not appropriate. Dalrymple, 334 F.3d at 995; see also Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004). To meet this burden, Plaintiff must satisfy a two-part test. McCullough v. Antolini, 559 F.3d 1201, 1205 (11th Cir. 2009). First, Plaintiff must show that Officer Edwards' conduct violated a constitutional right. Id. Assuming a violation occurred, Plaintiff must also show that the right was clearly established at the time of the incident. Id. The Court may decide these two issues in either order, but to survive a defendant's assertion of qualified immunity, the Plaintiff must make both showings. See Plumhoff v. Rickard, 134 S. Ct. 2012, 2020 (2014); Maddox v. Stephens, 727 F.3d 1109, 1120-21 (11th Cir. 2013).

---

[32] "Although an unpublished opinion is not binding . . ., it is persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam). See generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

When considering qualified immunity on a defendant's motion for summary judgment, the court considers the record in the light most favorable to the plaintiff, eliminating all issues of fact. "'By approaching the record in this way, the court has the plaintiff's best case before it. . . . [M]aterial issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment based on qualified immunity[.]'" Penley v. Eslinger, 605 F.3d 843, 848 (11th Cir. 2010) (citation omitted). "In other words, at the summary judgment stage, once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of the officer's actions is a pure question of law." Penley, 605 F.3d at 848-49 (internal quotations and emphasis omitted) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007)).

## 1. Constitutional Violation

"Although suspects have a right to be free from force that is excessive, they are not protected against a use of force that is necessary in the situation at hand." Jean-Baptiste v. Gutierrez, 627 F.3d 816, 821 (11th Cir. 2010) (quotations and citations omitted). When an excessive force claim arises in the context of an arrest or investigatory stop of a free citizen by a police officer, "it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." Graham v. Connor, 490 U.S. 386, 394 (1989). Thus, excessive force claims are properly analyzed under the Fourth Amendment's "objective reasonableness" test. Graham, 490 U.S. at 388; see also Plumhoff, 134 S. Ct. at 2020. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a

careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham, 490 U.S. at 396. "Because '[t]he test of reasonableness under the Fourth Amendment is not capable of a precise definition or mechanical application, . . . [citation omitted] its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (citing Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)); see also Scott, 550 U.S. at 383 (in determining whether the Fourth Amendment was violated, "we must still slosh our way through the factbound morass of 'reasonableness.'"). No precise test or "rigid preconditions" exist for determining when an officer's use of deadly force is excessive. See Scott, 550 U.S. at 394-95.

In determining the reasonableness of the force applied, the Court looks "at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance[s] the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." McCullough, 559 F.3d at 1206 (citing Scott, 550 U.S. at 383).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than "with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. In this regard, the "standard of reasonableness at the moment applies." Id.; see also Plumhoff, 134 S. Ct. at 2020.

The calculus of reasonableness must embody allowance for

> the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation.

Graham, 490 U.S. at 396-97; see also Plumhoff, 134 S. Ct. at 2020. The question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. "Officers may use force that is 'necessary to the situation at hand.'" Fils v. City of Aventura, 647 F.3d 1272, 1288 (11th Cir. 2011) (citation omitted).

The Eleventh Circuit has identified several circumstances that are relevant to the reasonableness of an officer's decision to use deadly force on a criminal suspect, including "the seriousness of the crime, whether the suspect poses an immediate danger to the officer or others, whether the suspect resisted or attempted to evade arrest, and the feasibility of providing a warning before employing deadly force." Jean-Baptiste, 627 F.3d at 821. An officer may used deadly force when he or she:

> (1) "has probable cause to believe that the suspect poses a threat of serous physical harm, either to the officer or to others" or "that he has committed a crime involving the infliction or threatened infliction of serious physical harm"; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible.[33]

Montero v. Nandlal, No. 13-13506, 2014 WL 7399085, at *3 (11th Cir. Dec. 31, 2014) (quoting McCullough, 559 F.3d at 1206); see also Garner, 471 U.S. at 11 ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical

---

[33] The Eleventh Circuit has declined to adopt a rule requiring that an officer must always warn the suspect before firing. Penley, 605 F.3d at 854 n.6; Carr v. Tatangelo, 338 F.3d 1259, 1269 n.19 (11th Cir. 2003).

harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.").[34] "In order to be entitled to qualified immunity, an officer need have only 'arguable probable cause'" to believe that the suspect poses a threat of serious physical injury, either to the officer or to others. St. George v. Pinellas Cnty., 285 F.3d 1334, 1337 (11th Cir. 2002); see also Clark v. City of Atlanta, Ga., 544 F. App'x 848, 856 (11th Cir. 2013) ("To be entitled to qualified immunity, 'an officer need only have arguable probable cause' to employ deadly force."); Garczynski v. Bradshaw, 573 F.3d 1158, 1167 (11th Cir. 2009) ("[A]n officer need only have arguable probable cause, not actual probable cause, in order to qualify for immunity from a Fourth Amendment claim."). This is because the issue is not whether "probable cause existed but whether the officer reasonably believed it existed, based upon the information he or she possessed at the time of the incident." St. George, 285 F.3d at 1337. Thus, a "reasonable but mistaken belief that probable cause exists for using deadly force is not actionable under § 1983." Carr v. Tatangelo, 338 F.3d 1259, 1269 & n.19 (11th Cir. 2003).

Additionally, the Court must analyze "the precise circumstances immediately

---

[34] The Eleventh Circuit, in Lenning v. Brantley Cnty., Ga., 579 F. App'x 727 (11th Cir. 2014), recently set for the following list of factors considered during an "objective–reasonableness inquiry;"

> (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others, including the possibility that the suspect was violent, dangerous, or armed; (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight; (4) whether the police action took place in the context of effecting an arrest; (5) the need for the application of force; (6) the relationship between the need for force and the amount of force used; (7) the duration of the action; (8) the number of persons with whom the police officers must contend at one time; (9) the extent of the injury inflicted; and (10) whether the force was applied in good faith or maliciously or sadistically.

579 F. App'x at 731 (citing Jackson v. Sauls, 206 F.3d 1156, 1170 n.18 (11th Cir. 2000)).

preceding" the officer's use of deadly force, and not consider earlier tactical decisions or events following the shootings. Carr, 338 F.3d at 1270; see also Oakes v. Anderson, 494 F. App'x 35, 40 (11th Cir. 2012) ("Our 'task is not to evaluate what the officers could or should have done in hindsight.'" (citation omitted)); Long v. Slaton, 508 F.3d 576, 579 n.4 (11th Cir. 2007) ("[T]he Fourth Amendment issue is whether an officer reasonably could have used deadly force when confronted with the situation at the scene, not whether a reasonable officer would have smoked marijuana before arriving. We judge the application of force to see if it was excessive, not the particular officer's qualities."). Indeed, the Eleventh Circuit has observed that

> [t]he Fourth Amendment's "reasonableness" standard and the standard of "reasonable care" under tort law are not the same. An officer may fail to exercise "reasonable care" as a matter of state tort law yet still act reasonably in the federal constitutional sense. "The United States Constitution [and] traditional tort law . . . do not address the same concerns."

Long, 508 F.3d at 580 n.6 (citation omitted).

Moreover, multiple shots by the police officer is not necessarily unreasonable under the Fourth Amendment. "A police officer . . . is entitled to continue his use of force until a suspect thought to be armed is 'fully secured,'" and the threat of serious physical harm to the officer or others is eliminated. Clark, 544 F. App'x at 856-57 (quoting Crenshaw v. Lister, 556 F.3d 1283, 1293 (11th Cir. 2009)); see also Plumhoff, 134 S. Ct. at 2022 ("[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended."); Cooper v. Rutherford, 503 F. App'x 672, 676 (11th Cir. 2012) (police fire 24 shots at fleeing armed bank robber, hitting innocent passengers in carjacking objectively

34

reasonable under the circumstances); <u>Jean-Baptiste</u>, 627 F.3d at 821 (qualified immunity

for officer who fired14 shots at suspect).

While all factual scenarios cannot be neatly categorized, an officer's use of deadly

force is objectively reasonable generally when the officer had reason to believe the

suspect was armed. In this context, regardless of whether the suspect draws a gun, an

officer's use of deadly force may be objectively reasonable for Fourth Amendment

purposes if the suspect has a gun "available for ready use." In these circumstances, the

officer is "not required to wait 'and hope[ ] for the best.'" <u>Jean-Baptiste</u>, 627 F.3d at 821

(quoting <u>Scott</u>, 550 U.S. at 385)).[35] Additionally, an officer's use of deadly force may be

---

[35] See, e.g. <u>Quiles v. City of Tampa Police Dep't</u>, No. 14-12875, 2015 WL 53707 (11th Cir. Jan. 5, 2015) (objectively reasonable to use deadly force without warning on an unarmed suspect fleeing from a traffic stop, who had physically struggled with officer, and who officers reasonably but mistakenly believed had taken the officer's gun during the struggle); <u>Lenning v. Brantley Cnty., Ga.</u>, 579 F. App'x 727 (11th Cir. 2014) (lengthy standoff with a man who threatened officer with a gun multiple times, and pointed the gun at the officer); <u>Clark v. City of Atlanta, Ga.</u>, 544 F. App'x 848 (11th Cir. 2013) (use of deadly force reasonable where the suspect pointed a gun at the officer); <u>Bodden v. Bodden</u>, 510 F. App'x 850 (11th Cir. 2013) (officer thought he saw the suspect pull a gun out of his waistband, and the suspect turned toward the officer with the object in his hand); <u>Oakes v. Anderson</u>, 494 F. App'x 35 (11th Cir. 2012) (deadly force reasonable as to intoxicated suicidal subject who officer had reason to believe had access to a gun and who was agitated and refused commands to raise hands or get out of the car and who officer saw "jerk his right hand out of the space between the seat and the console and start to move his arm across his body"); <u>Cooper v. Rutherford</u>, 503 F. App'x 672 (11th Cir. 2012) (use of deadly force reasonable where an armed robber, who officers thought was still armed, carjacked a vehicle with innocent third parties, including children, in the vehicle); <u>Jean-Baptiste v. Gutierrez</u>, 627 F.3d 816 (11th Cir. 2010) (deadly force used without warning on an armed robbery and burglary suspect engaged in a high-speed car and foot chase); <u>Vaughn v. City of Orlando</u>, 413 F. App'x 175 (11th Cir. 2011) (qualified immunity for officer who shot plain clothes officer who was pointing a gun at a person lying on the ground at college football stadium, after having received a report of a man with a gun in a crowd and hearing shots); <u>Penley v. Eslinger</u>, 605 F.3d 843 (11th Cir. 2010) (objectively reasonable for officer to fire a single shot in a split second decision at a 15-year old student who had what appeared to be a real semi-automatic firearm, but was in reality a modified plastic air pistol, who would not drop the weapon when commanded to do so, and who pointed the "gun" at the officer while children were in surrounding classrooms.); <u>Garczynski v. Bradshaw</u>, 573 F.3d 1158 (11th Cir. 2009) (an officer who used deadly force on an armed suicidal individual who pointed a gun at officers, and who failed to comply with the officers' command to drop the gun was entitled to qualified immunity); <u>Carr v. Tatangelo</u>, 338 F.3d 1259, 1264-65 (11th Cir. 2003) (officer believed he heard "chambering of a bullet" and that suspect pointed a gun at a fellow officer).

35

objectively reasonable when a suspect physically threatens an officer;[36] and when a

suspect uses his vehicle as a deadly weapon or in such a manner as to threaten serious

bodily harm to an officer or others.[37]

In contrast, "unprovoked force against a non-hostile and non-violent suspect who

has not disobeyed instructions violates that suspect's rights under the Fourth

Amendment." Fils, 647 F.3d at 1289. Thus, "non-violent suspects, accused of minor

crimes, who have not resisted arrest . . . are victims of constitutional abuse when police

use[ ] extreme force to subdue them." Id. Under this precept, it is not objectively

reasonable under the Fourth Amendment for an officer to use deadly force on a late night

driver who was parked and who had committed no crime and, in response to officer's

---

[36] See e.g. Harrell v. Decatur Cnty., Ga., 41 F.3d 1494 (11th Cir. 1995) (adopting dissent in Harrell v. Decatur Cnty., Ga., 22 F.3d 1570, 1573 (11th Cir. 1994)) (officer reasonably used deadly force on an armed burglary and robbery suspect; an officer may use deadly force to quell an intoxicated driving suspect who attacked the officer, severely beating the officer with the officer's flashlight, kicking the officer, threatening to kill the officer and searching for the officer's gun, and who got back into his car, and was reaching under the car seat when the officer fired).

[37] See, e.g., Plumhoff v. Rickard, 134 S. Ct. 2012 (2014) (objectively reasonable for officer to use deadly force on driver stopped on suspicion of drinking, who fled off in car instead of stepping out of vehicle as commanded by officer, and engaged in a dangerous high speed car chase in which suspect collided with police cars); Scott v. Harris, 550 U.S. 372 (2007) (officer acted objectively reasonably, when he caused traffic stop suspect, who engaged in a high speed car chase, to spin out his car, thus terminating the chase which endangered innocent bystanders); Johnson v. Niehus, 491 F. App'x 945 (11th Cir. 2012) (deadly force reasonable on traffic stop suspect who appeared to possess drugs in the car, who ignored the officers' commands, attempted to run over officers and pointed car toward another officer); Terrell v. Smith, 668 F.3d 1244 (11th Cir. 2012) (traffic stop driver failed to follow officer's command to kneel and instead jumped into his car and tried to flee, using the door of his vehicle to strike the officer); McCullough v. Antolini, 559 F.3d 1201 (11th Cir. 2009) (use of deadly force on drug suspect the subject of a late night traffic stop, where suspect refused command to put up his hands, followed by a high speed chase in which suspect drives his truck toward the officer, using his vehicle in a dangerous aggressive manner); Long v. Slaton, 508 F.3d 576 (11th Cir. 2007) (mentally unstable person tried to drive police cruiser, presenting a potential danger to the public, shot by officer after warning as the cruiser moved away); Robinson v. Arrugueta, 415 F.3d 1252 (11th Cir. 2005) (use of deadly force reasonable where drug suspect refused to raise his hands in response to officer's command, and used his car as a weapon, slowly driving towards the officer); Pace v. Capobianco, 283 F.3d 1275 (11th Cir. 2002) (deadly force objectively reasonable on traffic stop suspect who provided false information, struggled with police officer, then engaged in a 15 minute high speed reckless chase driving dangerously giving officers probable cause to believe the automobile had become a deadly weapon).

36

shout, shifted his car into park and raised his hands, considering the conflicting evidence in the plaintiff's favor, Morton v. Kirkwood, 707 F.3d 1276 (11th Cir. 2013); for an undercover officer to shoot a drug suspect who was driving away from a gas station, posing no risk of harm to the officer, Ayers v. Harrison, 506 F. App'x 883 (11th Cir. 2013); for an officer to administer multiple tasings to a nonviolent suspect where suspect put hands up, there were no directives to disobey, suspect was not resisting or attempting to escape and there was no danger to the officer, Fils, 647 F.3d at 1272; for an officer to use deadly force upon an unarmed fleeing suspect of a non-violent crime that posed no threat to the safety of the officer or others, Garner, 471 U.S. at 1; see also Hampton v. Atzert, No. 14-11728, 2014 WL 5571686 (11th Cir. Nov. 4, 2014) (same); Vaughan v. Cox, 343 F.3d 1323 (11th Cir. 2003); for an officer to fire a bean-bag gun in a deadly manner at the chest of a 67-year old man who, though not complying with police orders when he barricaded himself in his bedroom, posed no immediate threat of danger to the officers to justify the use of deadly force against him, Gaillard v. Commins, 562 F. App'x 870 (11th Cir. 2014); for an officer to use deadly force on a suicidal man with a knife, found on the kitchen floor crying, and who failed to drop the knife after being commanded to do so, where the subject did not threaten the officer and was "not committing a crime, resisting arrest or posing an immediate threat to the officers." Mercado v. City of Orlando, 407 F.3d 1152 (11th Cir. 2005); see also Calderin v. Miami-Dade Police Dep't, No. 14-13301, 2015 WL 468203, at *3 (11th Cir. Feb. 5, 2015) (shooting without warning a suicidal man who failed to raise his hands on command and instead pulled a thirteen-inch knife to his throat, while closest officer was more than 10 feet away, violated subject's Fourth Amendment right to not be subjected to unreasonable seizure); or for an

officer to use deadly force without warning on an unarmed disorderly and intoxicated suspect who had physically struggled with officer, and was pinned to the ground and immobilized with three officers standing over him; suspect's "earlier resistance does not, taken by itself, legitimize [the officer's] later decision to shoot him." Montero, 2014 WL 7399085, at *1, 4. Indeed, the Eleventh Circuit advises that a reasonable officer would not shoot "an unarmed man in a stationary vehicle while having no reason to believe that the man would place anyone's safety in danger." Morton, 707 F.3d at 1282.

Defendants rely upon the decisions in Oakes v. Anderson, 494 F. App'x 35 (11th Cir. 2012), Slattery v. Rizzo, 939 F.2d 213 (4th Cir. 1991), and DeBose v. City of Jacksonville, No. 3:09-cv-579-J-34MCR (M.D. Fla. Feb. 7, 2012) (Doc. 103) in support of their argument that Officer Edwards' use of deadly force was objectively reasonable such that it did not violate Mr. Williams' Fourth Amendment rights. In Oakes, the officer responded to a call about a suicidal subject, Oakes, who was sitting in a car in a shopping center parking lot. Upon arrival, witnesses told the officer that Oakes had been drinking for three days, and that Oakes had said he wanted to kill himself but was afraid to "pull the trigger." The witnesses showed the officer an empty gun case that had been removed from Oakes' vehicle. 494 F. App'x at 36. Based upon these circumstances, the officer was concerned that Oakes had access to a gun in the car. As back-up officers arrived, each was concerned that Oakes had access to a gun in the car. Oakes refused officers' orders to leave the vehicle. The officers spent more than fifteen minutes attempting to defuse the situation, but Oakes continued to refuse to cooperate and became increasingly agitated, struggling with officers who attempted to extract him from his car. Id. at 37. Officers could not see Oakes' right hand, and "[f]earful that Oakes was

38

reaching for his gun," one of the officers yelled "'gun, gun, gun'" to alert the other officers. Id. For the next thirty seconds, the officers commanded Oakes to raise his hands, and one of the officers, Officer Anderson, saw Oakes reach between the driver's seat and the center console, jerk his hand out of the space between the seat and the console, and start to move his arm across his body. Id. at 37-38. Believing that Oakes was "'fixing to fire,'" Officer Anderson shot twice and fatally wounded Oakes. Officer Anderson had not actually seen a gun. Id. at 38. While no gun was found in Oakes' hand, a loaded gun was later found between the driver's seat and the center console. Id. Viewing the totality of the circumstances, which included "an emotionally distraught man who had threatened suicide" and who "likely had a gun in his vehicle," id., and observing that there "was a good chance that [he] was pulling his gun out of the hole and could fire upon the officers in a split second," id. at 40, the Court held that the officer who had employed the use of deadly force was entitled to qualified immunity from the plaintiff's Fourth Amendment unlawful seizure claim.

While the subject in Oakes refused to comply with officers' orders to get out of his car and to show his hands, and was seen reaching between the driver's seat and the console, the similarities between the facts and circumstances in the Oakes case and those confronting Officer Edwards in the instant case end there. Unlike the officers in Oakes, Officer Edwards had no independent or articulable basis for concluding that Mr. Williams possessed a gun and was going to use it imminently. Rather, Officer Edwards based his conclusion solely upon Mr. Williams' refusal to raise his hands upon command, and his movements while sitting in the seat of his vehicle. In less than 90 seconds after the advent of a minor traffic stop, Officer Edwards made the determination that Mr.

William was going to "ambush" him with a gun, and that he should be prepared to use deadly force. Given these significant factual distinctions, the Oakes decision does not support a conclusion that Officer Edwards acted with arguable probable cause to believe that Mr. Williams posed a threat of serious physical harm to Officer Edwards, such that Officer Edwards is entitled to qualified immunity as a matter of law.

In Slattery, the Fourth Circuit Court of Appeals determined that an officer's use of deadly force was objectively reasonable. There, Slattery was a passenger in a vehicle that stopped in a parking lot that had a reputation of being an open air drug market. 939 F.2d at 214. The other occupants of the vehicle exited the car and approached an undercover officer posing as a narcotics dealer in an undercover sting operation. Id. at 215. An arrest was made, and Officer Rizzo moved his police van into the lot so as to block the vehicle where Slattery remained in the passenger seat. Officer Rizzo shined a flashlight into the car and saw Slattery, but he could not see Slattery's hands. The officer twice ordered Slattery to raise his hands, and Slattery failed to respond. Officer Rizzo kicked out the car door window and Slattery turned his head and looked at Officer Rizzo. The officer opened the car door and again ordered Slattery to raise his hands. The officer had drawn his service revolver. While Officer Rizzo could not clearly see Slattery's left hand, which was facing away from the officer, he was "able to see that the hand appeared to be partially closed around an object." Id. After yet another command to raise his hands, Slattery turned toward the officer, who still could not see Slattery's hands. Believing that Slattery was coming at him with a weapon, Officer Rizzo shot Slattery once in the face with his revolver. Id. The object in Slattery's hand was later determined to be a beer bottle. Id. The Fourth Circuit Court of Appeals granted Officer

40

Rizzo qualified immunity, finding, without discussion, that "a reasonable police officer could have had probable cause to believe that [Slattery] posed a deadly threat and therefore would be authorized to use deadly force." Id. at 216-17. The Court does not find that the Slattery decision requires a finding that Officer Edwards' use of deadly force was objectively reasonable. First, the decision of the Fourth Circuit, while providing guidance, is not binding precedent upon this Court, and does not constitute "clearly established law" for purposes of evaluating Officer Edwards' use of deadly force. Second, while a slim distinction, Officer Rizzo actually saw an object in Slattery's left hand that the officer construed to be a weapon. In contrast, Officer Edwards never saw a weapon or any other object in Mr. Williams' hands, and had no articulable independent basis for believing that Mr. Williams indeed was reaching for a weapon. Finally, the Fourth Circuit provides no support or convincing analysis for its decision.

In DeBose, officers, who had received a report of a robbery and that shots had been fired, were pursing a robbery suspect they believed had a gun. DeBose v. City of Jacksonville, No. 3:09-cv-579-J-34MCR. The suspect crashed his vehicle following a high-speed chase, and exited the car. The officers ordered the suspect to get to the ground and the suspect did not comply, instead lifting his shirt, reaching for a dark horizontal object in his waistband that appeared to the officer to be a gun, and raising his hand in a sweeping motion. Id. at 8. When the suspect turned to run, the officer shot the suspect, who fell to the ground and continued to crawl and reach for his waist. Still perceiving a threat, the officer shot again as other officers arrived on the scene. Id. The suspect was found to have had two black cell phone cases, and was unarmed. Noting that the officer reasonably believed that the suspect posed a risk of harm to responding

officers and residents of the neighborhood, the Court held that the officer's use of deadly force was objectively reasonable. As with Oakes and Slattery, the officer in DeBose had an independent and objectively reasonable basis for believing, albeit mistakenly, that the suspect had a gun and was preparing to use it. Such was not case for Officer Edwards.

The Court must focus on whether a reasonable officer, in Officer Edwards' position, had probable cause to believe that Mr. Williams posed a threat of serious physical harm, based upon the information Officer Edwards possessed at the time of the incident. As such, in determining the objective reasonableness of Officer Edwards' use of deadly force, the Court reviews the precise "morass of facts" presented to him at the moment that he fired seven shots at Mr. Williams. Mr. Williams had allegedly committed a minor traffic infraction; Mr. Williams immediately responded to Officer Edwards' blue lights, and pulled over off of a service road that had no parking lane, onto the first street he encountered and into a parking lot; Mr. Williams' car was blocked in by Officer Edwards' police cruiser, and Mr. Williams turned off the motor to his vehicle, averting any threat of Mr. Williams using the vehicle as a means of escape or as a deadly weapon. In addition, Officer Edwards' headlights were shining into Mr. Williams rear view mirror, in accordance with JSO procedure, inhibiting Mr. Williams' ability to see Officer Edwards as he approached Mr. Williams' vehicle. Mr. Williams failed to raise his hands as commanded and continued to reach toward the floorboard of his car. While Officer Edwards first stood on the driver's side of Mr. Williams' Taurus, he observed Mr. Williams "rocking back and forth," leaning forward with his right shoulder lower than his left, turning his head to the left, squinting into the driver's side mirror, looking back over his right shoulder, extending the fingertips of his left hand out of the open window of the driver's

door, just above the doorframe, pulling his left hand back into the vehicle, and leaning forward and looking at the floorboard. Officer Edwards stated that he was not in fear of his life at this point. Edwards Dep. at 140, 143-44.

Despite not being in fear of imminent danger, Officer Edwards decided to move to the passenger side of Mr. Williams' car, contrary to JSO procedure. When on the passenger side, Officer Edwards observed Mr. Williams leaning back in his driver's seat and sitting upright, then leaning forward and turning his head to look in the driver's side mirror, with his arms "down between his legs and tensed up." This was when Officer Edwards drew his service revolver. While still on the passenger side, with gun drawn, Officer Edwards observed Mr. Williams turn toward the officer "in tensed fashion," look directly at Officer Edwards, and then look back at the driver's side mirror. Mr. Williams continued to ignore repeated commands to raise his hands, and "cupped" the doorframe of the driver's side door with his left hand just above the inside door handle.

Within a minute of the commencement of the traffic stop, when Officer Edwards was on the passenger side of the Taurus, Officer Edwards made the determination that Mr. Williams had a gun and presented a threat based upon Mr. Williams' failure to comply with the officer's commands to raise his hands, and Mr. Williams' movement in the driver's seat, keeping his hands out of view. However, Officer Edwards presents no articulable basis to conclude that Mr. Williams was armed, or change of circumstances from the initial moments of the traffic stop when Officer Edwards was not in fear of imminent danger. Cf. Calderin, 2015 WL 468203, at *4 ("[S]peculation about erratic moves Calderin may have made or other weapons he may have had on his person are insufficient to justify the [deadly] force applied here when Calderin was merely holding the

43

knife."). Moreover, even under Officer Edwards' recitation of the facts, there is no indication that Mr. Williams made any threatening movement toward Officer Edwards, or was actively resisting or struggling with the officer. See Mercado, 407 F.3d at 1157; compare Phillips v. Bradshaw, No. 11-8002, 2013 WL 126331, at *5, 17 (S.D. Fla. March 28, 2013) (suspect observed reaching "frantically" into his pocket). Nevertheless, when still on the passenger side of the Taurus, Officer Edwards "observ[ed], orient[ed], decid[ed], and act[ed]." See Edwards Dep. at 159. Indeed, Officer Edwards testified that he made a decision and then relocated back to the driver's side of the Taurus to gain a "tactical advantage." Edwards Dep. at 164-65, 167.

After moving back to the driver's side of the Taurus, with his revolver drawn, Officer Edwards observed Mr. Williams had both hands between his legs with arms and shoulders "still tensed up." He observed Mr. Williams turn to look at the officer, "slightly blading his body and suddenly [making] a quick downward lunge," still looking at Officer Edwards over his left shoulder. Thus, the only movement that changed was Mr. Williams' quick "lunge" down, which Officer Edwards interpreted as "an overt, aggressive movement," causing him to discharge his weapon seven times. Edwards Dep. at 172.[38]

Officer Edwards never saw a weapon. His only basis for believing that Mr. Williams possessed a weapon was that Mr. Williams failed to raise his hands, and he "tensed up with both his hands in his groin." Because Mr. Williams suddenly lunged

---

[38] The Medical Examiner's Report and the police photographs establish that Mr. Williams was shot back to front, left to right, and overwhelmingly downward by Officer Edwards through the rear driver's side window of the Taurus. Taking all inferences in Mr. Williams' favor, this evidence could be construed as supporting an inference that Mr. Williams was seated in the driver's seat - which was inclined back slightly - at the time shots were fired, and not reaching down to the floorboard of the car or turning toward Officer Edwards.

downward, Officer Edwards fired his weapon at Mr. Williams seven times, a mere minute and a half after commencing the traffic stop. Officer Edwards cites to no objectively threatening behavior on the part of Mr. Williams that is different from that originally encountered, which caused him to fire his weapon. Officer Edwards was faced with a subject suspected only of a moving traffic violation, who had not acted aggressively toward the officer or resisted the officer violently. There were no other persons on the scene with which Officer Edwards needed to contend. Mr. Williams presented no escape risk. The subject was partially compliant, turning a shoulder toward the officer and extending his fingers out of the driver's side window. Any resistence by Mr. Williams to Officer Edwards by failing to show his hands upon command was nonviolent, and not in and of itself threatening. Moreover, construing the facts in favor of Plaintiff, Officer Edwards had ample opportunity to warn Mr. Williams that deadly force was a possibility if Mr. Williams continued to ignore commands to raise his hands. Officer Edwards' failure to warn was not objectively reasonable from the standpoint of a reasonable officer in his position. Under these circumstances, a reasonable police officer would not have concluded that Mr. Williams was "gravely dangerous." See Penley, 605 F.3d at 851.

While the Court cannot find a Fourth Amendment violation based solely upon allegedly negligent tactical decisions preceding Officer Edwards' use of deadly force, it is tasked with considering all of the facts and circumstances known to Officer Edwards, and viewed from his perspective at the moment that deadly force was used, including JSO policies and Officer Edwards' training.[39] Indeed, Officer Edwards relied on his training

---

[39] The cases relied upon by Defendants in support of their argument that the Court cannot question the tactical decisions made by Officer Edwards, are readily distinguishable. As set forth above,

(continued...)

and experience in ascertaining the threat he faced.  See Edwards Dep. at 146-48

("[p]olicy dictates if you're doing an unknown risk traffic stop and you become concerned

for your safety, you can pull your weapon out, which is exactly what I did."); Edwards

Decl. ¶ 12 (ascertaining, based on training and experience, that Mr. Williams' rocking

motion could have indicated an individual reaching for a wallet or hiding drugs or alcohol);

Edwards Decl. ¶¶ 24, 25 (relying on training and experience to conclude that Mr. Williams

"was planning an ambush").  That same training and experience directing Officer

Edwards' actions at the time he employed deadly force, also included waiting for back-up,

---

[39](...continued)

the officers in Oakes, 494 F. App'x 35, had an independent basis to believing that the subject had access to a weapon, and, in his agitated state, was about to use it.  In dicta, the Court rejected Plaintiff's suggestion that the officers made several tactical mistakes that escalated the situation, saying that its "'task is not to evaluate what the officers could or should have done in hindsight.'"  Id. at 39 (citation omitted).  Because, based upon all of the circumstances available to the officers in Oakes, the subject "likely had a gun" in the car, and there "was a good chance that [he] was pulling his gun out of the hole and could fire upon the officers in a split second," id. at 39, 40, the Oakes decision was decided on different facts and is distinguishable.

Likewise, in Carr, 338 F.3d at 1259, also cited by Defendants, the officer employed deadly force when he saw Carr point what the officer believed to be a gun, albeit mistakenly, into the bushes behind where a second officer was hiding, and heard the chambering of a bullet.  38 F.3d at 1269; see also Robinson v. Arrugueta, 415 F.3d 1252 (11th Cir. 2005) deadly force objectively reasonable where suspect who refused to raise his hands used his car as a weapon, driving slowly towards the officer); McLenagan v. Karnes, 27 F.3d 1002 (4th Cir. 1994) (officer believed that DUI check-point arrestee had taken a gun from a magistrate's office that he was found in).  In all of the cases cited by Defendants, the officer had an independent predicate reason for believing that the suspect possessed a gun.  In contrast, Officer Edwards had no such independent basis upon which to believe that Mr. Williams was reaching for a gun in his car other than his intuition and training.

Most significantly, because the events unfolded in less than 90 seconds, the facts and circumstances compress into one simultaneous act and are a part of the split-second calculation "immediately preceding" and facing Officer Edwards at the time he chose to fire his gun at Mr. Williams. The precise circumstances immediately preceding Officer Edwards' use of deadly force, from the perspective of Officer Edwards, necessarily include not only the perceived conduct of Mr. Williams, but also Officer Edwards' failure to warn Mr. Williams that the use of deadly force was a possibility, Officer Edwards' approach to Mr. Williams' vehicle, and Officer Edwards' failure to wait for back-up assistance. See McCullough, 559 F.3d at 1206 (considering the officer's knowledge of attendant circumstances and facts).  Thus, the Court considers these facts in making the determination whether a reasonable officer in Officer Edwards position, would have probable cause to believe that Mr. Williams posed a threat of serious physical harm.

and warning Mr. Williams, before employing deadly force. Officer Edwards did not wait for back-up because he was "focused" on Mr. Williams who Officer Edwards believed was preparing to "ambush" him. Edwards Dep. at 163-65, 167. He did not seek cover behind his patrol vehicle because he believed that if Mr. Williams fired at him, he could not return fire because the light shining from the patrol vehicle prevented him from seeing Mr. Williams, Edwards Dep. at 160-62, despite the fact that Officer Edwards parked his vehicle, in accordance with policy, such that the patrol vehicle lights were shining into the Taurus rear view mirrors to inhibit the driver's vision. While repeated commands may implicitly be construed as a deadly force warning, see Phillips v. Bradshaw, No. 11-8002, 2013 WL 1296331, at *17 (S.D. Fla. March 28, 2013), it is clear to the Court, that given Officer Edwards' testimony that he commanded Mr. Williams nine times to show his hands or put his hands on top of the steering wheel, it was feasible for Officer Edwards to warn Mr. Williams that the use of deadly force in the traffic stop was a possibility. Indeed, Officer Edwards acknowledges that he deviated from standard procedure because of Mr. Williams' actions in the vehicle. Edwards Dep. at 119-120, 124, 146-48. See generally Mercado, 407 F.3d at 1158 ("The officers were also aware that alternative actions, such as utilizing a crisis negotiation team, were available means of resolving the situation.").

The Court recognizes and respects the tense, uncertain and rapidly evolving situation Officer Edwards encountered. However, the perspective of a reasonable officer on the street necessarily brings with it a reasonable compliance with proper police practices and procedures. In balancing the interests of a citizen stopped for a traffic violation, with the governmental interest in protecting officers and other members of the public, a standard of objective reasonableness which ignores those standards designed

47

to achieve effective law enforcement is not reasonable. This is particularly true when a failure to reasonably comply with proper police practices and procedures contributes to the tension, uncertainty, and rapidity with which events evolve. It is axiomatic that a reasonable officer is not a plainly incompetent officer. To continence an officer's failure to follow training and practices and procedures designed to lessen the danger to officers and citizens alike, so as to cause or significantly contribute to the creation of escalating dangerous scenarios, is inconsistent with the balance properly struck between the need for effective law enforcement and citizen safety.

All of the factors counseling a determination of the objective reasonableness of a Fourth Amendment seizure, save that Officer Edwards was in fear of an imminent threat of physical harm, weigh in favor of Mr. Williams' Fourth Amendment right to be free from unreasonable seizure in the form of deadly force. See Montero, 2014 WL 7399085, at *5 (none of the factors indicate it was reasonable for police officer to shoot four times in rapid succession without warning an unarmed intoxicated suspect who was pinned and immobilized on the ground); Mercado, 407 F.3d at 1157-58 (factors weigh in favor of suicidal subject who refused to drop a knife when commanded to do so). Viewing the record in the light most favorable to the Plaintiff, a reasonable officer in Officer Edwards' position would not have arguable probable cause to believe that Mr. Williams was gravely dangerous, and that the use of deadly force was objectively reasonable under these circumstances. Accordingly, on this record, and construing the facts in favor of Plaintiff, the Court determines that a Fourth Amendment violation has occurred.

## 2. Clearly Established Law

Plaintiff must also establish that Mr. Williams' rights were "clearly established" at

48

the time of the shooting. Plumhoff, 134 U.S. at 2023. The violation of a constitutional right is clearly established if a reasonable official would understand that his conduct violates that right. See Fils, 647 F.3d at 1291. To be clearly established, the contours of the right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Plumhoff, 134 S. Ct. at 2023. "'[T]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendant[ ] that [his] alleged [conduct] was unconstitutional.'" Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)). "[T]he preexisting law must give real notice of practical value to government officials, considering the specific circumstances confronting them, and not just talk of some generalized, abstract intellectual concept." Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002). "'Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.'" Id. (citation omitted). "'Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only the plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit.'" Id. (citation omitted).

Fair warning for purposes of Officer Edwards is most commonly provided by materially similar precedent from the United States Supreme Court, the Eleventh Circuit Court f Appeals, or the Florida Supreme Court. See Terrell v. Smith, 668 F.3d 1244, 1255 (11th Cir. 2012); McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007). "Exact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from the pre-existing law." Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011); see also Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010).

> If there is no case law directly on point, "[g]eneral statements of the law contained within the Constitution, statute, or caselaw may sometimes provide 'fair warning' of unlawful conduct . . . . [Citation omitted.] These principles may give notice to officers, provided that the decisions clearly apply to the situation at hand. The "reasoning, though not the holding" of prior cases can also send "the same message to reasonable officers" in novel factual situations.

Mercado, 407 F.3d at 1159 (citation omitted).

> This method does not require that the case law be "materially similar" to the officer's conduct; officials can still be on notice that their conduct violates established law even in novel factual circumstances. . . . But, where the law is stated in broad propositions, "a very high degree of prior factual particularity may be necessary."

Fils, 647 F.3d at 1291 (citation omitted). As such, "[a]uthoritative judicial decisions may 'establish broad principles of law' that are clearly applicable to the conduct at issue." Montero, 2014 WL 7399085, at *4 (quoting Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1209 (11th Cir. 2007)); see also Morton, 707 F.3d at 1282 ("A right can be clearly established . . . even in the absence of precedent [if a] plaintiff can point to a 'broader, clearly established principle [that] should control the novel facts of [this] situation.'" (quoting Mercado, 407 F.3d at 1159)).

A second method for evaluating whether an officer's use of deadly force was contrary to clearly established law involves deciding whether the officer's conduct "'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law.'" Fils, 647 F.3d at 1291 (citation omitted). Qualified immunity is due to be denied if the preexisting law "make[s] it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue." Youmans, 626 F.3d at 563.

"This method - termed 'obvious clarity,' . . . - is a 'narrow exception' to the normal rule that only case law and specific factual scenarios can clearly establish a violation." <u>Fils</u>, 647 F.3d at 1291 (citation omitted); <u>see also</u> <u>Long</u>, 508 F.3d at 584; <u>Bussey-Morice</u>, 587 F. App'x at 627 ("[D]espite an absence of case law holding the specific conduct unlawful, a 'general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.'" (citation omitted)).

The clearly established standard at the time Officer Edwards made the decision to employ deadly force against Mr. Williams was that a reasonable police officer's use of deadly force is not excessive where he has probable cause to believe that the suspect poses a threat of serious physical harm to the officer or others. <u>Garner</u>, 471 U.S. at 11. That is, regardless of whether actual probable cause existed, if a reasonable police officer possessing the same particularized information as Officer Edwards could have, in light of <u>Garner</u>, believed that his conduct was lawful, then Officer Edwards is entitled to qualified immunity.

<u>Garner</u> and its progeny in existence prior to May 9, 2012, provide bench marks for determining whether an officer's use of deadly force is objectively reasonable, from the officer's perspective, or is in violation of the 4th Amendment. In 2010, the 11th Circuit summarized:

> [T]he use of deadly force is more likely reasonable if: the suspect poses an immediate threat of serious physical harm to officers or others; the suspect committed a crime involving the infliction or threatened infliction of serious harm, such that his being at large represents an inherent risk to the general public; and the officers either issued a warning or could not feasibly have done so before using deadly force. . . . [N]one of these conditions are prerequisites to the lawful application of deadly force by an officer seizing a suspect.

Penley, 605 F.3d at 850 (citing Scott, 550 U.S. at 382). Factors relevant in determining whether Officer Edwards' use of deadly force on May 9, 2012, included the severity of the crime under investigation, the threat posed by Mr. Williams to the safety of Officer Edwards or others, and whether Mr. Williams was resisting or attempting to evade arrest by flight, and whether a warning was given if feasible. Mercado, 407 F.3d at 1157; McCullough, 559 F.3d at 1206; Vaughan v. Cox, 343 F.3d 1323, 1329-30 (11th Cir. 2003); see generally Montero, 2014 WL 7399085, at *5. These factors "can be reduced to a single question: 'whether, given the circumstances, [the suspect] would have appeared to reasonable police officers to have been gravely dangerous.'" Penley, 605 F.3d at 851 (quoting Pace, 283 F.3d at 1281). The Court concludes that based upon clearly established law, as reviewed at length above, a reasonable police officer would not have concluded that Mr. Williams was "gravely dangerous," based upon the circumstances that unfolded during the 90 second random traffic stop.

To be sure, in the tense situation confronting Officer Edwards in the early morning hours of May 9, 2012, Officer Edwards was not required to review a checklist of factors before employing deadly force. However, the law required Officer Edwards to act in accordance with those guidelines, which were indeed imbedded in the JSO policies governing traffic stops and deadly force. The law at the time was clearly established that "police officers cannot use force that is 'wholly unnecessary to any legitimate law enforcement purpose.'" Mercado, 407 F.3d at 1160 (quoting Lee v. Ferraro, 284 F.3d 1188,1199 (11th Cir. 2002)). Additionally, Officer Edwards was on notice that an officer may constitutionally use deadly force only against a suspect whom the officer believes (1) "poses a threat of serious physical harm, either to the officer or to others" or (2) has

"committed a crime involving the infliction or threatened infliction of serious physical harm." Vaughan, 343 F.3d at 1329-30; see also Robinson v. Arrugueta, 415 F.3d 1252, 1255 (11th Cir. 2005); Mercado, 407 F.3d at 1157.

While the parties did not cite to, and the court could not locate a precedential decision presenting the exact same factual scenario as is presented here, the various tests that guide the determination of "objective reasonableness" in many different circumstances establish with obvious clarity as of May 12, 2012, the date of this incident, a reasonable officer may not use deadly force on a suspect who has not committed a serious crime involving the infliction or threatened infliction of serious physical harm; who has not threatened escape; who has not physically threatened or resisted the officer; who has not been warned that he may be the recipient of deadly force; and for whom the officer has no articulable basis for establishing that the suspect possesses a weapon and is capable of using it against the officer or others. The only facts relied upon by Officer Edwards to establish that he had arguable probable cause to believe that Mr. Williams posed a threat of serious physical harm are that Mr. Williams repeatedly failed to comply with the command to raise his hands and put them on the steering wheel, and that Officer Edwards speculated that Mr. Williams was reaching for a gun under the front seat of his car. Despite the absence of case law holding the specific conduct at issue here unlawful, general statements of the law and reasoning contained within the Constitution and prior decisional law provided reasonable officers in Officer Edwards' position, with "fair warning" and obvious clarity that it was not objectively reasonable under the Fourth Amendment for him to shoot with intent to kill the driver of a vehicle stopped for a minor traffic infraction, who was not overtly threatening the officer or suspected of having

53

committed a dangerous crime, in the circumstances presented. See Mercado, 407 F.3d at 1159. Accordingly, Officer Edwards' motion for summary judgment is due to be denied as to Count Two of the Complaint.

## B. Count Three: Municipal Liability for Unreasonable Seizure

Plaintiff alleges that the City is liable under § 1983 for unreasonable seizure for the following reasons: (1) "[t]here exists a documented history within the Jacksonville Sheriff's Office of unjustified shootings carried out by JSO officers, and a practice of allowing such shootings to continue without consequences for the officers involved in said shootings, and without steps to diminish such incidents," Complaint ¶ 33; (2) Sheriff Rutherford, his agents and employees "instituted and followed customs, practices, and policies which directly resulted in the unreasonable seizure" of Mr. Williams, id. ¶ 34; (3) "by failing to adequately discipline his officers for their unlawful actions and inactions, defendant Rutherford has ratified his officer's decisions and said officer's reasons for those decisions, thus constituting a policy, custom, and/or practice; id. ¶ 35; (4) "defendant Rutherford failed to adequately train his agents and employees with respect to the use of deadly force at unknown risk and/or high risk traffic stops despite a clear and obvious need for such training, reflecting a deliberate indifference to the constitutional rights" of Mr. Williams, and constituting a custom, practice and/or policy, id. ¶ 36; and (5) "there exists a widespread practice by which members of JSO shoot citizens under circumstances where such shootings are unjustified." Id. ¶ 37.

Plaintiff must surmount a high burden to hold the City liable for a deprivation of Constitutional rights under 42 U.S.C. § 1983. A municipality is not vicariously liable under § 1983 for the action of its employees. See, e.g., Mercado, 407 F.3d at 1161

54

(municipalities cannot be held liable for employees under the theory of respondeat superior). "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978); see also City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989). A county or municipality may be liable in a § 1983 action "only where the municipality itself causes the constitutional violation at issue." Cook ex. rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1116 (11th Cir. 2005) (citations omitted) (emphasis in original). Restated, a plaintiff must establish that an official policy or custom of the municipality was the "moving force" behind the alleged constitutional deprivation. See Monell, 436 U.S. at 693-94. Thus, "to impose § 1983 liability on a municipality, a plaintiff must show:

> (1) that his constitutional rights were violated; (2) that the
> municipality had a custom or policy that constituted deliberate
> indifference to that constitutional right; and (3) that the policy
> or custom caused the violation.

McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). To establish that an official policy caused the constitutional violation, Plaintiff must identify either "(1) an officially promulgated county policy, or (2) an unofficial custom or practice of the county shown through repeated acts of a final policymaker for the county." Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003). The policy requirement is designed to "'distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'" Id., 335 F.3d at 1329 n.5 (citation omitted) (emphasis in original). Indeed, municipal liability arises under § 1983 only where "'a deliberate choice to follow a

course of action is made from among various alternatives' by city policymakers." City of Canton, 489 U.S. at 389 (quoting Pembaur v. Cincinnati, 475 U.S. 469, 483-84 (1986)).

A municipality will rarely have an officially-adopted policy that permits a particular constitutional violation, therefore, in order to state a cause of action for damages under § 1983, most plaintiffs must demonstrate that the municipality has a custom or practice of permitting the violation. See Grech, 335 F.3d at 1330; McDowell, 392 F.3d 1289. To prove § 1983 liability against a municipality using the "custom or practice" option, a plaintiff must establish a practice so widespread that, "although not authorized by written law or express municipal policy, it is so permanent and well settled as to constitute a 'custom or usage' with the force of law." Brown v. City of Ft. Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991) (internal quotation marks and citations omitted). If a practice is "long-standing and widespread," it can be deemed authorized by the policy-making officials "because they must have known about it but failed to stop it." Brown, 923 F.2d at 1481. "[R]andom acts or isolated incidents are insufficient to establish a custom or policy." Depew v. City of St. Marys, Ga., 787 F.2d 1496, 1499 (11th Cir. 1986).

In that the Court has determined that Officer Edwards' use of deadly force constituted an unreasonable seizure in violation of Mr. Williams' Fourth Amendment rights, the Court turns to whether the record establishes that the City had a policy or custom constituting deliberate indifference to Mr. Williams' Fourth Amendment right, which caused the violation by Officer Edwards. Plaintiff has alleged several theories of "policy or custom," which will be addressed seriatim.

### 1.    Policy or Custom or "History" of Unjustified Shootings

The City argues that the record does not contain any evidence that "JSO officers

were not trained to use only appropriate, proportionate force or that 'biased-based' policing was rampant in JSO or that a pattern of excessive force by JSO officers was permitted or condoned by Sheriff Rutherford." City Motion at 11 (emphasis added). The Plaintiff cites to the City's failure to maintain a working Early Warning System and argues that its "disregard" for the system establishes the City's deliberate indifference. Response to City Motion.

The City cites to the Declaration of Thomas R. Hackney, who was the Director of Personnel and Professional Standards, from June 2013 through January 2014, and is currently Director of Investigations and Homeland Security. (Doc. 31-11 at 3; Hackney Decl.). Director Hackney states that the JSO does not have a policy, procedure, custom or practice of failing to train, supervise or discipline officers who use excessive force or engage in bias-based policing. Hackney Decl. ¶ 3. "[T]he JSO had in place an Internal Affairs unit (which investigates allegations of non-compliance with JSO's written policies and procedure) and an Integrity unit (which investigates allegations of criminal conduct by JSO employees)," and that both units "aggressively" seek to "detect and deter" any noncompliant conduct. Id. Director Hackney states:

> 4. All complaints of excessive or unnecessary force made against JSO police officers are reviewed by Internal Affairs. The JSO Response to Resistance ("RTR") Review Board reviews all instances of officer-involved shootings as well as other use of force incidents that result in serious injury or those in which a suspect's injury appears disproportionate to the level of force reported or indicated by the circumstances of the arrest or encounter. If it is determined that excessive or unnecessary force was used, the officer is disciplined. Agency operational orders in effect on 9 May 2012, specifically provided that officers are "to use only that degree of force which is reasonable and necessary to effect an arrest or to protect themselves or others from personal attack,

57

physical resistance, harm, or death." [Citation to General Order omitted.]. . . [I]t is the policy, practice and custom of JSO not to tolerate excessive or unnecessary force, or biased conduct, and to take remedial action if JSO becomes aware of such misconduct. [Citation to General Orders omitted.]

5.      The JSO also trains its officers how to conduct traffic stops (both "unknown" and "high" risk in nature) and to not engage in biased police practices. [Citation to Operational Order omitted.]

(Doc. 31-11 at 5; Hackney Decl. ¶¶ 4-5). The JSO is nationally accredited and

recognized for complying with national standards. Hackney Decl. ¶ 2.

The City's expert witness, David A. Klinger,[40] reports that

[d]uring the five year period between January 2007 through December 2011, members of the JSO discharged firearms in 160 separate incidents. Ninety-seven (97) of these incidents involved shots fired at human suspects, and 38 of the suspects in these incidents suffered fatal wounds. Following each of the 97 incidents in which officers discharged firearms at suspects, the JSO convened Response to Resistance Review Boards to review the incident and assess whether those officers who discharged their firearms did so in accord with JSO policy regarding use of deadly force.

(Doc. 31-18 at 23; Klinger Report). Moreover, according to Klinger, "[b]ecause the JSO

had the RTR Review Board in place, and used it to review all intentional shootings during

the five years preceding the incident in which Officer Edwards shot Mr. Williams, the

JSO's response to the use of deadly force by its officers during this time period included a

system to review shootings that is consistent with national standards for law enforcement

agencies regarding this critical aspect of police operations." Id. Klinger noted that "the

Board referred eight (8) cases to the JSO Internal Affairs Unit for consideration of

---

[40]  Plaintiff has not filed a Daubert motion challenging the expertise of the City's expert witness Klinger. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

possible misconduct and recommended further training for the involved officers in six (6) of those eight." Id. "Internal Affairs recommended that five (5) of these eight officers be disciplined for their actions." Id. Among the three officers who were not disciplined, one received formal counseling, and the other two resigned. Id.

The JSO annual Response to Resistance reports reflect the following statistics with regard to police shootings between 2008 and 2011:

| Year | Shootings | Fatalities |
|------|-----------|------------|
| 2008 | 44 | 14 |
| 2009 | 14 | 9 |
| 2010 | 12 | 4 |
| 2011 | 10 | 3 |

(Doc. 31-11; Hackney Decl. ¶ 7). As to traffic stops, the JSO Crime Analyst Unit statistics indicate that between 2007 and 2012, that JSO officers stopped drivers for routine violations (other than drunk and reckless driving) on 560,000 occasions. Id. ¶ 10. Of that number,

> 189 (.033%) escalated into a use of force of any kind against the driver. Of the 189 incidents involving officer use of force, only five prior to the Edwards/Williams incident involved the discharge of an officer's service weapon at the driver. . . . These five prior shooting incidents were reviewed by the JSO Response to Resistance Board and the officers' actions were found to have been within JSO policy and in line with training.

Id.

In City of Oklahoma City v. Tuttle, 471 U.S. 808 (1985), the Supreme Court explains:

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise, the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation.

Id. at 823-24 (footnotes omitted). The record contains ample evidence of adequate written policies with respect to the use of force and traffic stops, as well as procedures and means to monitor use of force incidents by officers, all of which are designed to uphold constitutional standards, and Plaintiff falls short of establishing otherwise. See Thompson v. Sheriff, Pinellas Cnty Fl., 542 F. App'x 826, 829 (11th Cir. 2013). Indeed, Plaintiff has not challenged the existence and effectiveness of the Sheriff's written policies with respect to traffic stops or the use of force. See id. The statistics set forth above do not establish a "pattern" or "practice" of excessive use of deadly force, much less a policy of deliberate indifference.

The evidence relied upon by Plaintiff is not sufficient to preclude summary judgment on the claim against the City. Mr. Williams' death cannot be imputed to a policy practice or custom of the JSO. Plaintiff has cited to no evidence of any City or Sheriff's Office policy relating to deadly use of force that caused Mr. Williams' death. Accord Jones v. Rutherford, 546 F. App'x 808, 811 (11th Cir. 2013) (Plaintiff does not clearly articulate how the City of Jacksonville is the "moving force" or "cite or identify a single problematic policy, much less provide any evidence that a policy actually caused

the alleged constitutional violation."). In contrast, the City cites to a number of JSO policies relating to use of force and traffic stops which are designed to prevent the unreasonable use of deadly force in a traffic stop. Accord id. Moreover, Plaintiff cannot establish municipal liability when he cannot "point to any other incidents involving similar facts." Mercado, 407 F.3d at 1162 (citing Gold v. City of Miami, 151 F.3d 1346, 1351 (11th Cir. 1998)). While Plaintiff may disagree with the JSO Internal Affairs or Response to Resistance review conclusions with regard to Officer Edwards' prior incidents, there is no evidence to suggest that the JSO review procedures merely rubber-stamped the use of force, or that the reviews in some way represent a widespread policy or custom promoting the unconstitutional use of deadly force. Plaintiff has failed to establish a fact issue as to the § 1983 municipal liability claim based upon policy or custom.

### 2. Failure to Train

The Plaintiff argues that "Officer Edwards' lack of sufficient training and supervision can be inferred from the event itself." Response to City Motion at 16. The Plaintiff contends that Officer Edwards' "pattern of behavior demonstrated that Officer Edwards was in need of training in the use of force, the use of the Taser, biased based policing and proper patrol tactics," and that the JSO's failure to properly train and supervise Officer Edwards "allowed him to escalate" into a pattern of behavior that included the use of deadly force. Id. at 17 (footnote omitted).

In 2011, the Supreme Court reaffirmed the substantial burden that must be carried by a plaintiff alleging that a municipality's failure to train constitutes a policy or custom warranting a finding of municipal liability. Connick v. Thompson, 131 S. Ct. 1350 (2011). The Court explained that in order to establish "policy, practice or custom" under a "failure-

to-train" theory, the plaintiff must prove both (1) that the policymaker (here, the Sheriff) "was deliberately indifferent to the need to train" officers and personnel; and (2) that the lack of training actually caused a constitutional violation. Id. at 1358. If the plaintiff fails to prove "deliberate indifference," the Court need not reach the issue of causation. Id. at 1358 n.5.

> "[D]eliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action . . . . Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program . . . . The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution."

Id. at 1360 (citations omitted); see also id. at 1365. "To establish a municipality's 'deliberate indifference,' a plaintiff must put forward some evidence that the municipality was aware of the need to train or supervise its employees in a particular area." Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami, Fla., 637 F.3d 1178,1188-89 (11th Cir. 2011). Thus, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick, 131 S. Ct. at 1360 (citation omitted). This is because "[w]ithout notice that a course of training is deficient, in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Id. However, a failure to train may amount to deliberate indifference when "the need for more or different training is obvious." Belcher v. City of Foley, Ala., 30 F.3d 1390, 1397-98 (1994). Thus, Plaintiff must bring forth some

evidence of a pattern of improper training to sustain the claim, and must show that the City was aware of the deficiencies in the program. See Mercado, 407 F.3d at 1161.

The Eleventh Circuit has repeatedly held that "without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train or supervise." Gold, 151 F.3d at 1351. Indeed, "the need for such training must be plainly obvious to [City] decisionmakers," such as where there is "evidence of a history of widespread prior abuse." Wright v. Sheppard, 919 F.2d 665, 674 (11th Cir. 1990) (alteration added); see also Rocker v. City of Ocala, Fla., 355 F. App'x 312, 314 (11th Cir. 2009).

> A city may be put on notice in two ways. First, if the city is aware that a pattern of constitutional violations exists, and nevertheless fails to provide adequate training, it is considered to be deliberately indifferent. . . . Alternatively, deliberate indifference may be proven without evidence of prior incidents, if the likelihood for constitutional violation is so high that the need for training would be obvious.

Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1293 (11th Cir. 2009) (citation omitted).[41] Importantly, "[i]n resolving the issue of the City's liability, 'the focus must be on

---

[41] The Court notes that the Supreme Court, in dictum, has left open the possibility that "a need to train could be 'so obvious,'" that a city could be held liable even without a pattern of prior constitutional violations. See Gold, 151 F.3d at 1352 (citing City of Canton, 489 U.S. at 390); see also Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1293 (11th Cir. 2009) ("Alternatively, deliberate indifference may be proven without evidence of prior incidents, if the likelihood for constitutional violations is so high that the need for training would be obvious."). The Supreme Court offered as an example the obvious need to train officers in the use of deadly force where the officers are provided firearms. City of Canton, 489 U.S. at 390 n.10. Plaintiff does not assert this argument, nor do the facts of this case fit into the "narrow range of circumstances" where a violation of federal rights may be a highly predictable consequence of the failure to train government employees. See Gold, 151 F.3d at 1352 (quoting Bd. of County Comm'rs v. Brown, 520 U.S. 397, 409 (1997)); see also Lewis, 561 F.3d at 1293-94 (finding that the need for training concerning the application of the hobble restraining device does not rise to a sufficient level of obviousness). Moreover, the evidence establishes that the City did train its officers, including Officer Edwards, in the use of firearms and deadly force, underscoring that the single-incident exception does not apply here. See Thompson, 542 F. App'x at 831 n.5 (nothing about tasing incident "indicated that it would have been patently obvious to the Sheriff beforehand that, in the absence of

(continued...)

the adequacy of the training programs in relation to the tasks the particular officers must perform,' and not merely on the training deficiencies for a particular officer." Lewis, 561 F.3d at 1293 ("It is thus irrelevant what training each specific officer present at the scene was given or retained." (citing City of Canton, 489 U.S. at 390)).

Sergeant Michael Scott Allen, who is a sworn police officer and since July 2010, has been assigned to the JSO Police Academy (Northeast Florida Criminal Justice Training and Education Center, "Academy"), as a training sergeant. (Doc. 31-16 at 3; Allen Decl.). Sergeant Allen's duties include firearms training and certification. He states that "[n]ew officer training includes training in the use of firearms and response to resistance/use of force (RTR) techniques and legal standards." Allen Decl. ¶ 4. All officers are required to re-qualify with firearms every six months, including classroom review of JSO policy and legal standards pertaining to the use of force. Id. (citing and attaching RTR Training Powerpoint). Since 2000, the JSO training includes the use of a simulator with "'shoot/don't shot'" scenarios intended to prepare officers for encounters with both armed and unarmed suspects. Id. ¶ 4. Additionally, the firearms training "includes training in the use of cover and concealment," regarding an officer standing behind an object for the protection of the officer. Id. ¶ 5. Moreover, new officer training includes a four-hour block of instruction regarding discriminatory profiling. Allen Decl. ¶ 6. Sergeant Allen states that all officers are trained to review and are required to acknowledge updates to written directives issued by the JSO. Allen Decl. ¶ 3.

---

[41](...continued)
additional supervision, [the officer] would be highly likely to tase improperly or otherwise use excessive force," despite prior citizen complaints, inasmuch as the officer "had received training with respect to the use of the taser.").

Officer Edwards attended and completed new officer training at the Academy in 2009, including a 48-hour block of instruction on traffic stops, covering "unknown risk" stops and "high risk" stops. Allen Decl. ¶ 3 (citing and attaching the instructor's guide and the JSO's written directive pertaining to traffic stops). He also completed training in use of firearms and response to resistance/use of force techniques and legal standards, and was re-qualified every six months as required by the JSO. Id. ¶ 4. Additionally, Officer Edwards received new-officer training plus additional in-service training regarding discriminatory profiling, including discriminatory profiling during traffic stops, and a "protocol for using good interpersonal skills when making traffic stops." Allen Decl. ¶ 6.

The evidence establishes that the City does provide training to police officers in the use of deadly force and in proper procedure for traffic stops. Plaintiff has adduced no evidence that the City's training program is inadequate in relation to the tasks the particular officers must perform, instead taking an ipse dixit approach to failure to train liability by contending that Officer Edwards' conduct alone is sufficient evidence of the City's failure to adequately train officers. As set forth above, proof of a policy or custom requires considerably more evidence of a history of widespread prior abuse such that the need for training was "plainly obvious" and the City was on notice. Wright, 919 F.2d at 674. However, even assuming that Officer Edwards needed additional training, municipal liability does not rest upon "training deficiencies for a particular officer." Lewis, 561 F.3d at 1293. See Craig v. Floyd Cnty., Ga., 643 F.3d 1306, 1310 (11th Cir. 2011) ("Pproof of a single incident of unconstitutional activity is not sufficient to impose liability' against a municipality.") (quoting Tuttle, 471 U.S. at 823-24)). "A pattern of similar constitutional violations is ordinarily necessary. A single incident would not be so pervasive as to be a

custom, because a custom must be such a longstanding and widespread practice that it is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." Craig, 643 F.3d at 1310 (internal quotation marks and citations omitted). Moreover, five incidents of prior taser usage by Officer Edwards, while possibly not ideal, are not sufficient to put the City on notice of the need for additional officer training with regard to use of deadly force, and/or that its review of deadly force was inadequate. See Graddy v. City of Tampa, No. 8:12-cv-1882-T-24EAJ, 2014 WL 272777, at *8 (M.D. Fla. Jan. 23, 2014). Indeed, Sheriff Rutherford states that Officer Edwards' conduct here was contrary to JSO training and policy. (Doc. 31-5 at 122; Rutherford Internal Affairs Letter).

By directing the Court to materials on record, the City has met its initial burden to show the absence of a genuine dispute over the question of whether any City policy or custom caused the alleged constitutional violation of false arrest. See Clark, 929 F.2d at 608 ("The moving party bears this initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."); see also Celotex Corp., 477 U.S. at 325 ("[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."). As a result, the burden shifts to Plaintiff to "go beyond the pleadings, and by [his] own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery, 64 F.3d at 593-94 (internal citations and quotation marks omitted). Plaintiff has not shown a persistent and wide-spread practice of inappropriate use of deadly force by JSO officers that would put the

66

City on notice of the need for additional training or that its review of deadly force was inadequate. See Davis v. Cothern, 482 F. App'x 495, 497 (11th Cir. 2012) (plaintiff "failed to put forth any evidence that [the county] knew it needed to improve its training regarding Fourth Amendment protections against wrongful arrest or excessive force.").

### 3. Failure to Discipline and Ratification of Conduct

Plaintiff's final argument, that Sheriff Rutherford, as final policymaker for the Jacksonville Sheriff's Office, ratified officers' alleged misconduct by failing to investigate and/or discipline, also fails. The Plaintiff bases her ratification theory upon the fact that the JSO's Early Warning System failed to flag Officer Edwards in 2011 and 2012 regarding prior tasing incidents and citizen complaints. Response to City Motion at 10-14. Plaintiff argues that a "jury could reasonably concluded that the JSO was deliberately indifferent to the problems with their early warning system," which "resulted in the death of Mr. Williams." Id. at 15. The City argues that Plaintiff fails to show a causal connection between alleged deficiencies in the Early Warning System and Officer Edwards' shooting of Mr. Williams. City Motion at 19. Additionally, the City contends the record contains no evidence that "actual problems or patterns . . . went unaddressed, or that any such instances or patterns were the 'moving force' of Officer Edwards' decision to shoot Mr. Williams." Id. at 21. The City proffers evidence establishing that between 2007 and 2012, five officers were suspended, terminated or chose to resign as a result of a use of excessive force, including one officer who was fired in 2009 for his use of deadly force. (Doc. 31-11 at 6; Hackney Decl. ¶ 8). Moreover, the City notes that Sheriff Rutherford attempted to fire Officer Edwards, but was overruled by binding arbitration. City Motion at 18.

The record establishes that Sheriff Rutherford does not condone or ratify an improper use of excessive force. See generally Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1145 (11th Cir. 2007) (citing to the fact that an officer was disciplined by the police department for his actions well in advance of the lawsuit as support for finding no municipal liability under § 1983).

> A municipality's failure to take remedial steps to correct constitutional violations is not deemed a policy unless "the failure to take remedial steps . . . amount[s] to a deliberate indifference or tacit authorization of the offensive acts." As the Eleventh Circuit has stated, "a persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct, thereby establishing a 'custom' within the meaning of Monell."

Troupe v. Sarasota Cnty., Fla., No. 8:02-cv-53-T-24MAP, 2004 WL 5572030, at *14 (M.D. Fla. Jan. 22, 2004) (internal citations omitted) (alterations in original), aff'd, 419 F.3d 1160 (11th Cir. 2005). In order to establish § 1983 liability under a ratification theory, a plaintiff must show "a persistent failure to take disciplinary action against officers" who use deadly force giving rise to "the inference that a municipality has ratified conduct, thereby establishing a 'custom' within the meaning of Monell." Fundiller v. City of Cooper City, 777 F.2d 1436, 1443 (11th Cir. 1985); see also Church v. City of Huntsville, 30 F.3d 1332, 1345 (11th Cir. 1994) ("A municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a 'custom or policy' if the municipality tacitly authorizes these actions or displays deliberate indifference toward the police misconduct.").

Plaintiff fails to cite to evidence of widespread constitutionally offensive conduct that the Sheriff or the City deliberately ignored or ratified. Instead, Plaintiff cites only to

the JSO's Early Warning System in support of her ratification and failure to discipline theory. However, none of the incidents cited were deemed to have been contrary to JSO policy. Moreover, as noted by Plaintiff's expert, Charles W. Drago,

> Each of the Response to Resistence Reports initiated by Officer Edwards were viewed and approved by the officer's chain of command. The reports were then forwarded to the Department of Personnel and Professional Standards where they were supposed to be entered into the Early Warning System. Therefore, the information was available to his immediate supervisors as well as to the highest levels of the police department.

(Doc. 43-1 at 18; Drago Report).[42]

In Thompson, 542 F. App'x 826, the Eleventh Circuit rejected plaintiff's argument that three citizen complaints against the officer in question demonstrated a pattern of similar constitutional violations and placed the Sheriff on notice that deputies were engaging in conduct constituting an excessive use of force, as falling "far short of the requisite proof." 542 F. App'x at 828-29. Indeed, the Court found that any deficiencies in the police department's computerized Personnel Intervention System due to operational challenges were overcome by the Sheriff's manual back-up system of review. 542 F. App'x at 829 n.2. Likewise, the JSO had in place its Response to Resistance (RTR) review procedure, which prompted review of all of Officer Edwards' prior tasing incidents by three officers in each case, and JSO Internal Affairs reviewed all three citizen

---

[42]  The Defendants have filed a Daubert motion seeking to exclude the opinion of the Plaintiff's police practices expert Charles W. Drago. (Doc. 38). That motion is still pending. The Court may not consider inadmissible expert opinion testimony when deciding a motion for summary judgment. See Vaughn v. Nacco Materials Handling Grp., Inc., 440 F. App''x 821, 823 (11th Cir. 2011). However, Plaintiff does not cite to the opinion of Mr. Drago in her responses to the motions for summary judgment, and the Court does not consider Mr. Drago's ultimate opinions here. The Court cites to Mr. Drago's Report only as it pertains to this factual matter which is supported by the record.

complaints. In each case, the JSO investigation concluded that the tasings complied with department policy, and the citizen complaints of wrongdoing were unsubstantiated. Plaintiff has adduced no evidence that these reviews were inadequate, and indeed, "a perfect investigation is not necessary." Thompson, 542 F. App'x at 829. As in Thompson, "the record evidence falls far short of indicating any deficiency in the system sufficiently obvious to place the Sheriff on notice that additional supervision was necessary to prevent the likely use of excessive force and deprivation of constitutional rights." Id. at 829 at n.2. Moreover, Plaintiff has failed to establish how any alleged deficiency in the Early Warning System caused Officer Edwards to use deadly force against Mr. Williams. See Echols v. Gardiner, No. H-11-0882, 2013 WL 6243736, at *10-11, 12 (S.D. Texas Dec. 3, 2013) (plaintiffs failed to show how police department's under-investigation officer-involved shootings was the "moving force" causing the officer's actions). Plaintiff's argument is "built on a series of inferences" for which she offers no proof. Id. at *11.

Plaintiff's limitation of its "ratification" theory to the City's failure to flag Officer Edwards, a single officer, does not establish a "widespread practice" or custom or policy of overlooking or ratifying questionable officer behavior. See Montano v. City of Chicago, 535 F.3d 558, 570-71 (7th Cir. 2008). Additionally, as to Officer Edwards, Plaintiff has not drawn the similarities between the prior tasing incidents and citizen complaints and Officer Edwards' use of deadly force on Mr. Williams such as to put the City on notice of the need for additional supervision and discipline, other than allude to the fact that the subjects of Officer Edwards' use of force were all African-American, See Thompson, 542 F. App'x at 829 n.3 (prior tasing incidents were not comparable to the tasing incident at

issue). The facts regarding each prior incident were widely divergent, were investigated and reviewed by the JSO, and were found to conform with department policies. It is a giant leap from the JSO's treatment of five tasing incidents and three citizen complaints regarding one officer to a department-wide policy and custom on the level of "deliberate indifference" regarding the use of deadly force during a traffic stop which caused Officer Edwards to violate Mr. Williams' constitutional rights. Plaintiff has failed to provide sufficient evidence of policy or custom of inadequate investigation of citizen complaints or Response to Resistence incidents that caused the constitutional injury to Mr. Williams. The evidence in the record does not support Plaintiff's failure to discipline/ratification theory of municipal liability as a matter of law.

### C. Count One: Negligence of Jacksonville Sheriff's Office and the City of Jacksonville[43]

Plaintiff alleges in Count One of the Complaint that the City, through its police officers, "had the duty to use reasonable care in the exercise of deadly force in traffic stops in Jacksonville, including the traffic stop of the decedent." Complaint ¶ 26. Plaintiff alleges that the duty of reasonable care was breached by Officer Edwards because he "used deadly force in the absence of appropriate conditions for the use of such deadly force." Id. Plaintiff alleges that Officer Edwards breached the duty of care to Mr. Williams when he failed to conform to JSO policies pertaining to deadly force, firearms, traffic

---

[43] The Court construes this claim as one brought pursuant to Florida's Wrongful Death Act. "Because wrongful death did not exist at common law, all claims for wrongful death are created and limited by Florida's Wrongful Death Act." Cinghina v. Racik, 647 So. 2d 289, 290 (Fla. 4th DCA 1994). Florida's Wrongful Death Act, Sections 768.16-.26, Florida Statutes, provides a right of action "[w]hen the death of a person is caused by the wrongful act [or] negligence . . . of any person . . . and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued . . . ." Fla. Stat. § 768.19.

stops including "unknown risk stops," and "high risk stops," and by failing to wait for the arrival of requested back-up before using deadly force. Id. Additionally, Plaintiff alleges that the City failed to properly train and supervise Officer Edwards in the use of deadly force. Id. Plaintiff alleges that this breach of duty proximately caused Plaintiff's injury and damages. Id. ¶ 27.

Defendant City characterizes Plaintiff's Count I negligence claim as one of vicarious liability "for Officer Edwards having 'negligently shot' Mr. Williams." City Motion at 24. The City argues that such a claim lacks merit because "there is no such cause of action as negligent use of excessive force under Florida law." Id. The City contends that the facts are undisputed that "Edwards intentionally shot Williams," and that there is no evidence that "anything the City did was the proximate cause of the shooting." Id. Alternatively, the City argues that while "it is unclear what theory of negligence Plaintiff is attempting to assert," the undisputed facts establish that Officer Edwards shot Mr. Williams "because he was objectively and reasonably in fear of imminent death or great bodily harm at the hands of Williams . . . ." Id. at 24. Plaintiff responds that she is permitted to plead a claim of negligent use of deadly force in the alternative to an intentional tort. Response to City Motion at 18.

### 1. **Officer Edwards' Alleged Negligence**

#### a. **Duty of Care**

In Florida, an employer is liable for the negligent acts of an employee occurring within the scope and course of employment. See Feliciano v. City of Miami Beach, 847 F. Supp. 2d 1359, 1367 (S.D. Fla. 2012) (citing Fernandez v. Fla. Nat'l Coll., Inc., 925 So. 2d 1096, 1100 (Fla. 3d DCA 2006) and Burch v. Sun State Ford, Inc., 864 So. 2d 466,

471 (Fla. 5th DCA 2004)).  Florida law allows a plaintiff to recover against a municipality for the tortious acts of its employees based upon a theory of respondeat superior.  Brown v. City of Clewiston, 848 F.2d 1534, 1543 n.18 (11th Cir. 1988); see also Fla. Stat. § 768.28.[44]  Florida has waived it sovereign immunity "under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of this state."  Fla. Stat. 768.28(1).  Thus, Plaintiff is permitted to sue the City for the alleged torts of Officer Edwards so long as the tort is one that can be brought against a private citizen.  See Whittier v. City of Sunrise, 395 F. App'x 648, 651 n.7 (11th Cir. 2010); see also Lewis v. City of St. Petersburg, 260 F.3d 1260, 1262 (11th Cir. 2001) ("When a state or its subsidiary is sued in negligence, a court should first determine whether the circumstances alleged would subject a private person

---

[44]    Florida's waiver of sovereign immunity statute, Section 768.28(9)(a), Florida Statutes, provides that:

> No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. . . . The exclusive remedy for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers shall be by action against the governmental entity, or the head of such entity in her or his official capacity, or the constitutional officer of which the officer, employee, or agent is an employee, unless such act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Fla. Stat. § 768.28(9)(a).  Thus, police officers are immune from suit unless they acted willfully or wantonly.  Id.  Plaintiff alleges and argues that Officer Edwards was negligent, not that he is individually liable for acting with bad faith or malicious purpose.  As such, Plaintiff's negligence claim must be brought against the City.

There is no dispute that the Plaintiff has complied with all conditions precedent required by § 768.28, Fla. Stat.  See Complaint ¶ 2; (Doc. 5; Answer ¶ 2).

to liability under Florida law.").

To state a claim for negligence under Florida law, a plaintiff must establish that the defendant owed the plaintiff a duty of care, that the defendant breached that duty, and that the breach caused the plaintiff to suffer damages. Lewis, 260 F.3d at 1262. Florida does not recognize a cause of action for negligent use of deadly force because excessive force is an intentional tort more akin to battery. Lewis, 561 F.3d at 1294; City of Miami v. Ross, 695 So. 2d 486, 487 (Fla. 3d DCA 1997); see also Vaughn v. City of Orlando, No. 6:07-cv-1695-Orl-19GJK, 2009 WL 3241801, at *8 (M.D. Fla. Sept. 29, 2009), aff'd, 413 F. App'x 175 (11th Cir. 2011); City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d DCA 1996) ("If excessive force is used in an arrest, the ordinarily protected use of force by a police officer is transformed into a battery."). "[I]t is inapposite to allege the negligent commission of an intentional tort, such as the use of excessive force." Lewis, 561 F.3d at 1294 (citing Ross, 695 So. 2d at 487; Sanders, 672 So. 2d at 48). Thus, as under Lewis v. City of West Palm Beach, the claim of "negligent" use of deadly force fails. 561 F.3d at 1294.

However, Florida law "clearly recognizes a cause of action for the negligent handling of a firearm and the negligent decision to use a firearm separate and distinct from an excessive force claim." Lewis, 260 F.3d at 1263.

> [A] separate negligence claim based upon a distinct act of negligence may be brought against a police officer in conjunction with a claim for excessive use of force. Nevertheless, the negligence component must pertain to something other than the actual application of force during the course of the arrest.

Id. (quoting Sanders, 672 So. 2d at 48) (internal citations omitted) (emphasis added).

To the extent Plaintiff's claim of negligence with regard to Officer Edwards' conduct purports to allege negligent use of deadly force, the claim fails under Florida law. It is undisputed that the evidence in the record establishes that Officer Edwards intentionally shot Mr. Williams because "[he] believed, absolutely, that Williams was about to shoot [him]." Doc. 31-19; Edwards Decl. ¶ 38).

However, Plaintiff's claim, and the evidence presented in the record, that Officer Edwards breached his duty of care by failing to conform with JSO policy and by failing to wait for the arrival of requested back up, constitutes other evidence in support of a "separate and distinct" negligence claim involving Officer Edwards' alleged negligent handling of a firearm and negligent decision to use a firearm, for which the City could be held vicariously liable. See Lewis, 260 F.3d at 1263-64. The evidence pertaining to Officer Edwards' conduct in creating the situation in which he perceived that the use of deadly force was necessary, by failing to follow sound police procedures, forms the basis of a "separate negligence claim based upon a distinct act of negligence [that] may be brought against a police officer in conjunction with a claim for excessive use of force." Sanders, 672 So. 2d at 48; see also Vogel v. City of Miami, No. 07-20436-CIV, 2007 WL 3355404, at *8-9 (S.D. Fla. Nov. 8, 2007).

The decision in Vogel is analogous. In Vogel, members of the Broward County Sheriff's Office bomb squad, believing that a parked vehicle may have contained explosives, detonated the car "as part of what bomb squad personnel refer to as a 'render safe' procedure." 2007 WL 3355404, at *1 & n.3. After the render safe procedure was completed, the car and its contents were inspected and no explosives were found. The package in the back seat of the vehicle was determined to be a bucket of gray paint and

photo negatives. Officers with the City of Miami Police Department detained Ms. Vogel, owner of the vehicle, for approximately 30 minutes, and did not permit her to reunite with her car until after it had been destroyed. Id. at *2. Ms. Vogel brought a number of civil rights claims and state law tort claims against the Broward Sheriff's Office, the City of Miami, and the individual officers involved in the rendered safe procedure and plaintiff's detention. Id. at *3. In Count III, Plaintiff asserted a negligence claim against the City, premised upon the allegation that "'[t]he search, seizure, damage and destruction of the Plaintiffs' property . . . was negligent and unreasonable," in breach of the City's duty to exercise reasonable care. The City urged summary judgment in its favor arguing that a negligence claim cannot be premised upon intentional acts, citing Sanders, 672 So. 2d at 48. Id. at *8. The court was persuaded by Plaintiffs' argument that the claim was based upon the officers' negligent failure to investigate before using the "render safe" procedure on the vehicle, holding that the negligence claim was pleaded as an alternative to Plaintiffs' § 1983 claim alleging that the search and seizure of the vehicle was unconstitutional. Id. at *9. In doing so, the court determined that the "negligence claim is premised not upon actions that necessarily must be pleaded as an intentional tort, but upon a decision-making process that could potentially have been carried out in a negligent manner." Id.

Indeed, the Florida Supreme Court, in Rodriguez v. Miami-Dade Cnty., 117 So. 3d 400 (Fla. 2013), recognized that a negligence claim could be brought against a county for the negligent acts of its police officer in conjunction with the officer's use of deadly force. In Rodriguez, business owner Rodriguez and police officers both responded to a burglary alarm at Rodriguez's business. Id. at 402. Rodriguez alleged that after exiting his vehicle,

he was shot from behind four times by Officer Hernandez, who failed to provide any warning before firing his gun. Id. Rodriguez filed suit against the County, alleging that he was negligently shot by the police officer. Id. In opposing the County's motion for summary judgment based upon sovereign immunity premised upon the police emergency exception, Rodriguez argued that the police emergency exception did not apply to shield the County from liability, and that "Officer Hernandez responded recklessly to the scene of the burglary alarm, violated basic safety procedures, and negligently created the situation where he shot an innocent civilian." Id. at 403. The court affirmed the trial court's denial of the County's motion for summary judgment as to the negligence claim, finding that there were disputed issues of fact whether a serious emergency existed and "whether the police response created or added to the danger." Id. at 408. In doing so, the Florida Supreme Court stated that "disputed issues of fact remain, including whether the police created or substantially contributed to the shooting through negligent acts," and that "the focus is on whether or not the police officers were negligent under all the circumstances, which would include the fact that the police officers were responding to a burglary, and whether they perceived that they were facing a serious threat that required immediate action through the use of deadly force." Id. In rejecting the application of the police emergency exception, the Rodriguez court concluded:

> There is no question that, by virtue of what police officers do every day, they are often exposed to dangerous situations, especially when responding to calls involving crimes in progress. But it is quite another thing to say that when the police respond to those situations, their employer is always immune from suit arising from negligent acts.

Id.

Plaintiff's Count I negligence claim based upon Officer Edwards' conduct is one that may be brought against a private individual, thus surviving the first prong of the sovereign immunity analysis. Fla. Stat. 768.28(1). Moreover, the record here presents a factual question as to whether, under the totality of the circumstances presented, Officer Edwards reasonably perceived that he was facing an immediate threat that required immediate use of deadly force, whether Officer Edwards breached his duty to exercise reasonable care in his decision to used deadly force, and whether that breach of duty caused injury to Mr. Williams.

### b.    Discretionary or Operational

"If a court is satisfied that a duty of care is owed to the plaintiff, the court must still determine whether the challenged actions are nonetheless acts which required the exercise of basic governmental decisions, as opposed to the implementation of an already established policy." Lewis, 260 F.3d at 1262. This is because the State's "waiver of sovereign immunity would still not apply if the challenged acts of the state agent were 'discretionary' governmental acts rather than merely 'operational' ones." Id.

Florida's "sovereign immunity waiver does not apply if the challenged act of the state agent was 'discretionary' rather than 'operational.'" Albra v. City of Ft. Lauderdale, 232 F. App'x 885, 887 (11th Cir. 2007) (citing Lewis, 260 F.3d at 1262); see also Cook ex. rel. Estate of Tessier, 402 F.3d at 1117-19. "An act is 'discretionary' when all of the following conditions have been met:

> (1) the action involves a basic governmental policy, program, or objective; (2) the action is essential to the realization or accomplishment of that policy, program, or objective; (3) the action require[s] the exercise of basic policy evaluation[s], judgment[s], and expertise on the part of the governmental

> agency involved; and (4) the governmental agency involved
> possess[es] the requisite constitutional, statutory, or lawful
> authority and duty to do or make the challenged act, omission,
> or decision.

Lewis, 260 F.3d at 1264 (quoting Trianon Park Condo. Ass'n v. City of Hialeah, 468 So.

2d 912, 918 (Fla. 1985) (internal quotations omitted); Kaisner v. Kolb, 543 So. 2d 732,

737 (Fla. 1989)). "To distinguish claims involving police operation from claims involving a

discretionary policy-making function, the Court looks to see whether the claim challenges

implementation of an already established policy or whether it seeks to alter the content of

a training program." Thomas v. City of Jacksonville, No. 3:13-cv-737-J-32MCR, 2014 WL

3587404, at *3 (M.D. Fla. July 18, 2014) (citing Wynn v. City of Lakeland, 727 F. Supp.2d

1309, 1318 (M.D. Fla. 2010)). Court intervention in exercise of executive or legislative

power by way of tort law would "inappropriately entangle it in fundamental questions of

policy and planning.'" Lewis, 260 F.3d at 1264-65 (quoting Dep't of Health and

Rehabilitative Servs. v. Yamuni, 529 So. 2d 258, 260 (Fla 1988); Kaisner, 543 So. 2d at

737)). Conversely, an "operational" act does not implicate a policy decision, but rather

"reflects a secondary decision as to how those policies or plans will be implemented."

Lewis, 260 F.3d at 1265 (citing Kaisner, 543 So. 2d at 737).

Officer Edwards' use of deadly force is not entitled to state sovereign immunity.

"[W]hen an officer has made an initial discretionary decision to conduct a stop and then

proceeds to carry out that decision, the officer is no longer exercising a 'discretionary'

function, but is engaged in an 'operational' task." Lewis, 260 F.3d at 1265 (citing Kaisner,

543 So. 2d at 734, 737-38). See generally Rodriguez, 117 So. 3d at 406-407 ("manner in

which an officer orders a motorist to the side of the road is not a policy-making or

planning decision that is protected from tort liability" (citing Kaisner, 543 So. 2d at 737-38)). Likewise, an officer's decision as to whether to use a firearm is "'not necessary to or inherent in policy or planning,' and 'merely reflects a secondary decision as to how those policies or plans will be implemented.'" Id. at 1264 (quoting Kaisner, 543 So. 2d at 737). The City's motion for summary judgment is due to be denied as to Count I, the negligence claim based upon Officer Edwards' alleged "other" negligence.[45]

---

[45] The Court recognizes that Florida law provides that "'a presumption of good faith attaches to an officer's use of force in making a lawful arrest and an officer is liable for damages only where the force used is clearly excessive.'" Sullivan v. City of Pembroke Pines, 161 F. App'x 906, 911 (11th Cir. 2006) (quoting Sanders, 672 So. 2d at 47) (emphasis in original). Additionally, pursuant to Section 776.05(1), Florida Statutes, law enforcement officers "'need not retreat or desist from efforts to make a lawful arrest because of resistence or threatened resistence to the arrest.'" Terrell, 668 F.3d at 1252-53 (quoting Fla. Stat. § 776.05). "Law enforcement officers are provided a complete defense to an excessive use of force claim where an officer 'reasonably believes [the force] to be necessary to defend himself or another from bodily harm while making the arrest.'" Sanders, 672 So. 2d at 47 (quoting Fla. Stat. § 776.05(1). Moreover,

> [u]nder Florida law, "[a] person who uses force as permitted in § 776.012 [in self defense] . . . is justified in using such force and is immune from criminal prosecution and civil action for the use of such force." Fla. Stat § 776.032(1). Section 776.12 of the Florida Statutes in turn establishes that individuals have no duty to retreat before using deadly force. Id. § 776.012. However, the statute limits the justifiable use of deadly force to specific circumstances, such as when the actor "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another." Id. § 766.012(1).

Penley, 605 F.3d at 855.

While the Court's determination regarding qualified immunity from suit brought under 42 U.S.C. § 1983 was a legal one, the analysis of the record in this case make clear that factual questions exist on this record as to whether the force used was "clearly excessive," and whether Officer Edwards "reasonably believed" that deadly force was necessary to defend himself from bodily harm and that his use of force was "justified," such that Plaintiff's negligence claim with regard to Officer Edward's conduct survives summary judgment.

## 2.   The City's Alleged Negligent Training and Supervision[46]

To the extent that Plaintiff is asserting a claim of negligent supervision and negligent failure to train directly against the City, Plaintiff survives the first § 768.28 hurdle because both torts of negligent supervision and negligent failure to train are recognized in Florida. See Mercado, 407 F.3d at 1162. In order to make out a claim of negligent training, Plaintiff must establish that the City was "negligent in the implementation or operation of the training program." Id. The tort of negligent supervision requires a showing of "(1) the existence of a relationship giving rise to a legal duty to supervise; (2) the negligent breach of that duty; and (3) that the negligence was the proximate cause of plaintiff's injury." Nationwide Mut. Co. v. Ft. Myers Total Rehab. Ctr., Inc., 657 F. Supp. 2d 1279, 1291 (M.D. Fla. 2009) (citing Collins v. Sch. Bd. of Broward Cnty., 471 So. 2d 560, 563 (Fla. 4th DCA 1985)). The "breach" element of a negligent supervision claim requires the plaintiff to prove "facts sufficient to show that once an employer received actual or constructive notice of problems with an employee's fitness, [and] it was unreasonable for the employer not to investigate or take corrective action." Hardy, 907 So. 2d at 660 (citation omitted). Stated simply, "[n]egligent supervision occurs when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails

---

[46]   Neither the City nor Plaintiff mentioned Plaintiff's negligent failure to train or supervise claim in their Motion or Response, though Plaintiff did list it as having been alleged in the Complaint. City Motion at 24; Response to City Motion at 18-20. "In opposing a motion for summary judgment, 'a party may not rely on [her] pleadings to avoid judgment against [her].'" Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 598-99 (11th Cir. 1995) (citation omitted). "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." Id. at 599. Because Plaintiff did not substantively assert her negligent failure to train and supervise claim as an alternative reason for denying the City's Motion for summary judgment as to Count One, the claim is arguably abandoned. The Court will, nonetheless, address the claim as though it is still properly asserted.

to take further actions such as investigation, discharge, or reassignment." Id. (citation omitted). Thus, a claim for negligent supervision requires "a connection and foreseeability between the employee's employment history and the current tort committed by the employee." Dep't of Envtl. Prot. v. Hardy, 907 So. 2d 655, 661 (Fla. 5th DCA 2005) (citation omitted); see also Bello v. Johnson, 442 F. App'x 477, 480 (11th Cir. 2011) (dismissing a claim of negligent supervision for plaintiff's failure "to plead facts that established the County should have foreseen, based on its employees' work history, that they would commit the current tort").

Plaintiff must establish that the City's alleged failure to supervise or to train Officer Edwards "constituted an operational duty" rather than a discretionary one, before Plaintiff can seek to recovery of any damages. Mercado, 407 F.3d at 1162. While sovereign immunity is waived for implementation or operation of a city's training program, a city cannot be held liable for claims about the content of police training and supervision. Thomas, 2014 WL 3587404, at *3 (citing Cook ex rel. Estate of Tessier, 402 F. 3d at 1111). "The determination of the content of a training program is a discretionary function for which the [C]ity is afforded sovereign immunity." Mercado, 407 F.3d at 1162 (citing Lewis, 260 F.3d at 1266). "A city's decision regarding how to train its officers and what subject matter to include in the training is clearly an exercise of governmental discretion regarding fundamental questions of policy and planning" and therefore a claim challenging such a decision is barred by the discretionary function exception to the waiver of sovereign immunity in Section 768.28, Florida Statutes. Lewis, 260 F.3d at 1266; see also Cook ex. rel. Estate of Tessier, 402 F.3d at 1117-19. To the extent that Plaintiff is challenging the City's discretionary decisions regarding training and supervision, the

"discretionary function" exception to Florida's waiver of sovereign immunity applies and this claim is barred. Cook ex. rel. Estate of Tessier, 402 F.3d at 1118-19.

Moreover, assuming arguendo that this claim is not barred, Plaintiff has failed to present any evidence establishing (or creating a material fact) that the Sheriff or City breached any duty, or that any such breach was the proximate cause of Mr. Williams' death. To the extent Plaintiff contends the City is negligent in the implementation of training, and supervision, no evidence has been presented creating a fact issue as to any such claim. See Response to City Motion at 18-19. Rather, the undisputed material facts show that each alleged prior incident involving Officer Edwards was fully investigated and found to have been handled within the parameters of existing policies and procedures.

While not specifically pleaded, the only evidence cited by Plaintiff in support of negligent supervision and negligent failure to train claims being brought against the City, is the failure of the JSO's Early Warning System to alert Officer Edwards' supervisors of three previous citizen complaints and five Use of Force incidents involving Officer Edwards in 2011 and 2012. As set forth above, all prior Response to Resistance incidents involving Officer Edwards were indeed reviewed by his chain of command and were determined to be in compliance with JSO policy. Thus, the failure of the early Warning System did not mask Officer Edwards' five Use of Force incidents. Under the JSO's Response to Resistence procedure, JSO supervisors reviewed each of Officer Edwards' prior Use of Force incidents. Thus, any operational failure of the Early Warning System was mitigated by the JSO's Response to Resistence procedure. Moreover, to the extent that a change in functioning of the early Warning System was due to the JSO's decision to change vendors, Plaintiff's claim implicates a policy decision, and thus a

discretionary function, for which the City is entitled to sovereign immunity. Even assuming arguendo that the City's training and supervision of Officer Edwards were "operational" and thus not entitled to sovereign immunity, Plaintiff adduces no evidence that establishes that the JSO negligently failed to train and supervise Officer Edwards. Plaintiff merely concludes that Officer Edwards' prior incidents coupled with the use of deadly force against Mr. Williams, establish as a fact that the City failed to train and supervise him. Additionally, Plaintiff cites to no evidence in the record establishing that JSO's alleged failure to train or supervise Officer Edwards indeed caused injury to Mr. Williams. For these reasons, Plaintiff's negligent failure to train and supervise claims brought against the City fail as a matter of law.

Upon due consideration, it is hereby

**ORDERED**:

1.     Defendant Jeffrey Edwards' Motion for Summary Judgment (Doc. 29) is **GRANTED IN PART AND DENIED IN PART** as follows:

     a.     The Motion is **denied** as to **Count Two** of the Complaint (Doc. 2).

     b.     The Motion is **granted** as to **Count Four** of the Complaint (Doc. 2).

2.     Defendant City of Jacksonville's Motion for Final Summary Judgment (Doc. 30) is **GRANTED IN PART AND DENIED IN PART** as follows:

     a.     The Motion is **granted in part and denied in part** as to **Count One** of the Complaint (Doc. 2), as set forth above.

          1)     The Motion is **granted** as it pertains to Plaintiff's Count I claim of negligent training and supervision by the City.

2)   The Motion is **denied** as it pertains to Plaintiff's Count I claim

of negligence by Officer Edwards.[47]

b.   The Motion is **granted** as to **Count Three** and **Count Five** of the

Complaint (Doc. 2).

**DONE AND ORDERED** in Jacksonville, Florida, this $\underline{17}^{th}$ day of February, 2015.

BRIAN J. DAVIS
United States District Judge

jl

Copies furnished to:

Counsel of Record

---

[47]   To the extent that Count One of the Complaint is brought against The Jacksonville Sheriff's Office, that claim is dismissed as redundant of the Count One claim brought against the City of Jacksonville.